**Rene L. Valladares**
Federal Public Defender
Nevada State Bar No. 11479
**Allie Wilson**
Assistant Federal Public Defender
200 South Virginia Street, Suite 340
Reno, Nevada 89501
(775) 321-8451
allie_wilson@fd.org

Attorney for **Esteban Adame-Lopez**

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| **United States of America**, | Case No. 3:23-cr-024-LRH-CLB |
| Plaintiff, | **Motion to Dismiss** |
| v. | [Hearing Requested][1] |
| **Esteban Adame-Lopez**, | |
| Defendant. | |

**I.     Introduction**

Mr. Adame-Lopez is charged with possessing a handgun despite having a prior felony conviction under 18 U.S.C. § 922(g)(1). That charge impacts his "right . . . to keep . . . Arms." U.S. CONST. amend. II. And, as with Hawaii's butterfly-knife ban in *Teter*, the government will be unable to show a constitutionally-adequate tradition of "distinctly similar" regulations criminalizing possession of a handgun. *Teter v. Lopez*, 76 F.4th 938, 947-55 (9th Cir. 2023). So, this indictment violates Mr. Adame-Lopez's Second Amendment rights under *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). This case should therefore be dismissed.

---

[1] This motion is timely filed. ECF No. 16.

## II. Background[2]

Mr. Adame-Lopez was walking around Gentry Way and Kietzke Lane in Reno, NV when he was stopped by law enforcement officers. The officers had been attempting to locate him because he had a bench warrant for failing to appear at a status hearing for a case in the Reno Justice Court. Once he was restrained in handcuffs, Mr. Adame-Lopez admitted to having a 9mm handgun on his person, which the officers recovered.

Mr. Adame-Lopez has a prior felony conviction and was charged in the instant indictment as a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). He now moves to dismiss the indictment against him as unconstitutional under *Bruen* and its Ninth Circuit progeny: *Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023) and *Baird v. Bonta*, 81 F.4th 1036 (9th Cir. 2023).

## III. Argument

### A. *Bruen*, *Teter*, and *Baird* govern this case.

*Bruen*, *Teter*, and *Baird* alone control this case. There is no other prior Ninth Circuit precedent propping up this statute. And so, this Court should apply the ordinary *Bruen* analysis—as developed in *Teter* and *Baird*—to this motion.

A district court is generally bound to follow prior decisions of the court of appeals for its corresponding geographic circuit. But that general rule gives way when the United States Supreme Court issues a decision that conflicts with then-applicable circuit law. If that "intervening Supreme Court authority" is "clearly irreconcilable" with prior circuit authority, "district courts should consider themselves bound by the intervening higher authority and

---

[2] The background facts discussed below are drawn from the discovery the government has thus far provided and are presented only for purposes of this motion. Mr. Adame-Lopez reserves the right to challenge and supplement these alleged facts with his own investigation and with any information that may be discovered.

reject the prior opinion of this court as having been effectively overruled." *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc).

To determine whether a prior opinion is irreconcilable, courts look to both "'the holdings of higher courts' decisions'" and those decisions' "'mode of analysis.'" *Id.* (quoting Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175, 1177 (1989)). If the Supreme Court decision "undercut[s] the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable," then the Supreme Court decision controls. *Id.* The intervening Supreme Court opinion need not directly overrule prior circuit cases. *Id.* And the issue the Supreme Court resolves "need not be identical in order to be controlling." *Id.* So long as the approaches are "at odds," the newer Supreme Court opinion governs. *Id.*

*Bruen* rewrote the rules for determining whether a firearm law satisfies the Second Amendment. Previously, courts of appeals (including the Ninth Circuit) had evaluated such laws under a two-step test: history-and-tradition *plus* means-end scrutiny. *United States v. Chovan*, 735 F.3d 1127, 1134–42 (9th Cir. 2013). In the pre-*Bruen* regime, courts first considered whether the law was consistent with analogous gun restrictions from the Nation's founding and early history. *Id.* at 1136–38. If it was, the law passed constitutional muster. *Id.* But if it was not, the law could still survive at the second step through a balancing test; if the government's interest in the restriction outweighed the infringement on the individual, step two authorized it. *Id.*

*Bruen* changed the applicable analysis in at least two ways. First, *Bruen* got rid of the second means-end step entirely. *Bruen*, 142 S. Ct. at 2127 ("[I]t is one step too many."). And, second, it tinkered with the first history-and-tradition step. While some courts of appeals had imposed a defense-side burden to show a restriction's inconsistency with history, *Bruen* requires that the government "affirmatively prove that its firearms regulation is part of the historical tradition." *Id.* In the process, *Bruen* recommended considerations in the requisite

historical analysis that were either unidentified in prior appellate decisions or irrelevant under those decisions' modes of analysis. *See id.* at 2131.

The analysis under *Bruen*, therefore, is a straightforward (if intensive) one-step history-and-tradition analysis: if the government cannot "identify an American tradition" justifying a firearms restriction, the law fails. *Id.* at 2138. No "means-end scrutiny" applies. *Id*. at 2125, 2138. Instead, absent a historical analogue, the inquiry ends, and the law is unconstitutional.

This new test effectively abrogates all prior Ninth Circuit decisions—indeed, all federal court of appeals decisions everywhere—about firearms restrictions. Like "every Court of Appeals to have addressed the question," the Ninth Circuit had previously applied the pre-*Bruen* "two-step framework" in "evaluating whether a firearm regulation is consistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2174 (Breyer, J., dissenting); *id.* at 2125 (majority opinion identifying that the courts of appeals had "coalesced" around that mode of analysis); *see Chovan*, 735 F.3d at 1134–37 (applying that two-step test). And the Ninth Circuit had also applied a presumption of lawfulness to certain statutes, concluding that some (like § 922(g)(1)) were protected from scrutiny even absent a full historical analysis. *See, e.g., United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010) (relying on *Heller*'s "presumptively lawful" language to reject a Second Amendment challenge to § 922(g)(1)).

Those moves are "clearly irreconcilable" with *Bruen*. *Gammie*, 335 F.3d at 900. There is no longer a two-step analysis. There is just one step. *Bruen*, 142 S. Ct. at 2127. And there are no presumptions in favor of certain statutes. The government must now "affirmatively prove" that each challenged statute complies with historical tradition. *Id.* Since Ninth Circuit law on the subject is "directly at odds" with those precepts, it is no longer binding on this Court. *Gammie*, 335 F.3d at 900.

*Bruen* abrogated *Chovan* and *Vongxay*. And so, this Court should apply the ordinary *Bruen* analysis—as developed in *Teter* and *Baird*—to this motion, rather than any pre-*Bruen* Ninth Circuit test.

**B.     *Bruen*, as applied by *Teter*, requires a two-point analysis.**

*Teter* clearly laid out the two inquiries required under *Bruen*. The Court must first review the plain text of the Second Amendment to determine whether that text clearly covers the regulated conduct. If it does, then there is a presumption of unconstitutionality that the government bears the burden of overcoming by proving a comparable historical tradition of firearms regulation.

### 1.     The threshold "plain text" inquiry.

*First*, the Court conducts a "plain text" threshold inquiry. *Teter*, 76 F.4th at 948. That requires the Court to evaluate only whether the Second Amendment's text "naturally encompasses" the regulated conduct under "ordinary interpretive principles." *Id.* (first quote quoting *Bruen*, 142 S. Ct. at 2143). If it does, the regulation is presumptively unconstitutional. *Id.* This initial threshold stage is, in other words, pure text; no gloss. *Id.*

### 2.     The historical-tradition analysis.

*Second*, if the Amendment's "plain text" protects the conduct, the government bears the burden to overcome the presumption of unconstitutionality by "affirmatively prov[ing]" a comparable "historical tradition" of firearm "regulations." *Bruen*, 142 S. Ct. at 2127, 2131.

There are a range of rules for this historical-tradition analysis. The first (and perhaps most important) is that the government bears the burden of proof. To carry that burden, the government has to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. That requires it to bring the Court actual laws that "evince" such a tradition. *Teter*, 76 F.4th at 951; *Baird*, 81 F.4th at 1047 (emphasizing that it is the government's "duty"—"not the court's"— to "collect and present historic analogues"); *accord, e.g.*, *United States v. Daniels*, 77 F.4th 337, 344 (5th Cir. 2023) ("[T]he government has the burden to find and explicate the historical sources."). If the government does not proffer any laws whatsoever, the indictment should be dismissed. *Bruen*, 142 S. Ct. at 2127, 2130 n.6; *see also Baird*, 81 F.4th at 1041 ("A

5

district court should not try to help the government carry its burden by sifting historical materials to find an analogue." (quotation, alteration, and ellipses omitted)).

There are also rules about how to look at the historical laws the government may cite. The central rule here is that "not all history is created equal"; during-Founding evidence is the gold-standard. *Id*. at 2131–32. That is because "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Id*. at 2136 (quotations omitted) (emphasis in original). By contrast, earlier historical evidence "may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years." *Id*. Similarly, post-ratification laws that "are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id*. at 2137 (quotations and emphasis omitted). And 20th-century evidence is all but irrelevant; *Bruen* refused to even address "any of the 20th-century historical evidence brought to bear" because it is too late to "provide insight into the meaning of the Second Amendment." *Id.* at 2154 n.28 In brief: the further one of the government's purported analogues is from 1791, the worse it fares.

It also matters what kind of problem the challenged statute purports to address. On this front, statutes fall into one of two categories.

The first and broadest category includes any statute that "addresses a general societal problem that has persisted since the 18th century." *Id.* at 2131. With this first type, the historical inquiry "will be relatively straightforward." *Id.* When faced with a modern general-societal-problem statute, courts assess whether "a distinctly similar historical regulation address[ed] the problem." *Id*. If there is none that did, or if the government offers only regulations that addressed the problem "through materially different means," then the challenged statute violates the Second Amendment. *Id*. Likewise, if earlier generations considered but then rejected comparable modes of regulation as unconstitutional, "that rejection surely would provide some probative evidence of unconstitutionality." *Id.*

The second and narrower category of statutes includes statutes targeting "unprecedented societal concerns," "dramatic technological changes," or problems

"unimaginable at the founding." *Id.* at 2132. These are evaluated with "reasoning by analogy." *Id.* And the question with these is whether the challenged regulation is "relevantly similar" to an earlier one, with special attention to "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id*. at 2132–33.

Most statutes fall into the first, general-societal-problem category. *Bruen* itself is illustrative. There, the Court held that New York's effective bar on concealed-carry permits targeted a general societal problem: "handgun violence, primarily in urban areas." *Id.* at 2131 (cleaned up). And so, for New York's restriction to pass constitutional muster, the state had to "demonstrate a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense" with "distinctly similar" laws. *Id*. at 2138, 2131; *see also Teter*, 76 F.4th at 954 (applying the "distinctly similar" standard because "the problem of people using easily concealable, foldable knives in violent crimes predates 1999 by hundreds of years").

There are also rules about what metrics a court needs to assess about each purported analogue identified by the government. To be an adequate analogue, a historical law must share both "how" and "why" with the challenged statute: the two must impose a "comparable burden" and have a "comparabl[e] justifi[cation]." *Bruen*, 142 S. Ct. at 2133. These requirements require checking three boxes in every case; to qualify as an appropriate analogue, the historical law must:

☐ "curtail[] the right . . . to a comparable degree";

☐ impose penalties with "comparable severity"; and

☐ have a "comparable [level of] enforcement."

*Baird*, 81 F.4th at 1047. If any of these boxes is left unchecked, the purported analogue fails. *Id.*

And, finally, the government needs to run multiple different statutes through that checklist. It cannot get by, for instance, with "one solitary statute." *Teter*, 76 F.4th at 952. Nor can it get by with "categories of outliers." *Id.* Rather, the government must "demonstrate a

*tradition*" of regulation that aligns on all the above metrics. *Id.* (emphasis in original). In other words, the government needs laws—plural. *Id.*

If all these rules sound "demanding," that is intentional. *Baird*, 81 F.4th at 1046. "[T]he *Bruen* standard for identifying a closely analogous historical regulation is a demanding one." *Id.* Even so, the bottom line for a court is often "relatively 'straightforward'": if the government fails any step in this gauntlet, the government has not met its burden. *Teter*, 76 F.4th at 954 (quoting *Bruen*, 142 S. Ct. at 2131).

C. **The indictment fails under *Bruen*, *Teter*, and *Baird*.**

Applying the above framework, the indictment against Mr. Adame-Lopez is unconstitutional. The Second Amendment's plain text protects the conduct regulated by the charged statutes here. And, the government will be unable to prove a tradition of distinctly-similar regulations of the sort necessary to sustain its charge. This indictment should therefore be dismissed.

1. **The Second Amendment's "plain text" protects this conduct.**

Possessing a firearm—here, a 9mm handgun—is conduct covered by the plain text of the Second Amendment. The Amendment's plain text protects "the right of the people to keep . . . Arms." U.S. CONST. amend. II.

First, "arms" includes "all firearms." *Teter*, 76 F.4th at 949 (quotation omitted). It is "irrelevant" whether a given firearm "has military value" or "[was] in existence at the time of the founding." *Id.* Rather, "all instruments that constitute bearable arms" get the Amendment's protections. *Id.* (quotations omitted). Possessing a handgun is thus conduct protected by the plain text of the Amendment. *See id.*

Second, "the people" includes individuals with prior felony convictions. As the Supreme Court identified in *Heller*, "the people" protected by the Second Amendment "unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580. And so, because "felons" are not "categorically excluded from our national community," they fall within the amendment's scope. *Kanter v. Barr*, 919 F.3d 437,

8

453 (7th Cir. 2019) (Barrett, J., dissenting), *majority opinion abrogated by Bruen*, 142 S. Ct. 2111; *accord Folajtar v. Att'y Gen. of the U.S.*, 980 F.3d 897, 912 (3d Cir. 2020) (Bibas, J., dissenting). Individuals' prior misdeeds, in other words, do not permanently divest them of constitutional rights.

Comparison to other rights confirms as much. As *Heller* explained, "the people" is a "term of art employed in select parts of the Constitution," including "the Fourth Amendment, . . . the First and Second Amendments, and . . . the Ninth and Tenth Amendments." 554 U.S. at 580 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). Mr. Adame-Lopez is, for instance, among "the people" whose "persons, houses, papers, and effects" enjoy Fourth Amendment protection. U.S. Const. amend. IV; *see, e.g.*, *United States v. Lara*, 815 F.3d 605, 609 (9th Cir. 2016). Mr. Adame-Lopez likewise enjoys "the right of the people" to "petition the government for redress of grievances." U.S. Const. amend. I; *see, e.g.*, *Entler v. Gregoire*, 872 F.3d 1031, 1039 (9th Cir. 2017). If Mr. Adame-Lopez is one of "the people" protected by the First and Fourth Amendments, *Heller* and *Bruen* confirm that he is one of "the people" protected by the Second Amendment, too.

Concluding that ex-felons are part of "the people" aligns with the post-*Bruen* decision reached by the Third Circuit in *Range. See Range v. Att'y Gen. of the U.S.*, 69 F.4th 96 (3rd Cir. 2023). In *Range*, the government argued that only those who are "law-abiding" and "responsible" get Second Amendment rights. *Range*, 69 F.4th at 101-103. The Third Circuit rejected that argument for four reasons:

> (1) the use of "law-abiding" and "responsible" language in *Heller*, *McDonald*, and *Bruen* was "dicta" because "the criminal histories of the plaintiffs . . . were not at issue in those cases," *id.*;
>
> (2) people with felony convictions are not "exclude[d]" from "the people" in other constitutional guarantees, *id.*;
>
> (3) that having a right does not mean that such a right is absolute, *id.*; and
>
> (4) the phrase "law-abiding, responsible citizens" is "hopelessly vague" and prone to "widely divergent" interpretations, *id.*

9

These problems, the Third Circuit concluded, put the government's law-abiding-and-responsible-citizens position at odds with constitutionalism itself. *Id.* at 103. "At root," the Third Circuit identified, "the Government's claim . . . devolves authority to legislators to decide whom to exclude from 'the people.'" *Id.* And such an approach, the Third Circuit reasoned, would impermissibly "give[] legislatures unreviewable power to manipulate the Second Amendment by choosing a label." *Id.* at 104 (quoting *Folajtar*, 980 F.3d at 912 (Bibas, J., dissenting)). Doing so conflicts with the principle that "the enshrinement of constitutional rights"—like Second Amendment ones—"necessarily takes certain policy choices off the table." *Id.* (quoting *Heller*, 554 U.S. at 636). The legislature cannot, in other words, tinker with who gets constitutional rights simply by statute. *Id.* People with felony convictions are still people. *Id.* They get constitutional rights like everyone else. [3]

The conclusion that individuals with felony convictions maintain their right to bear firearms and ammunition makes practical sense, too. These individuals "need arms for lawful self-defense just as much as the rest of us do." Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and A Research Agenda*, 56 UCLA L. Rev. 1443, 1499 (2009). That someone has been convicted of a crime in the past does not diminish that need; arguably, it could increase it.

---

[3] Other courts have reached the similar conclusions. The Northern District of Iowa has held that individuals with prior domestic violence misdemeanor convictions can likewise assert the right. *United States v. Bernard*, No. 22-CR-03, 2022 WL 17416681, at *7 (N.D. Iowa Dec. 5, 2022). As to individuals accused of crimes, the Fifth Circuit, for instance, has held that individuals accused of domestic violence can assert the Second Amendment right. *United States v. Rahimi*, 61 F.4th 443, 453 (5th Cir. 2023), *cert. granted*, 143 S.Ct. 2688 (emphasizing that an individual need not be "a model citizen" to be "entitled to the Second Amendment's guarantees"). The Western District of Texas has held that individuals under felony indictment can too. *United States v. Quiroz*, No. 22-CR-104, 2022 WL 4352482, at *8-10 (W.D. Tex. Sept. 19, 2022); *see also Worth v. Harrington*, No. 21-cv-1348, 2023 WL 2745673, at *6–9 (D. Minn. Mar. 31, 2023) (concluding that 18–20 year-olds are part of "the people" even though they generally could not vote for much of the nation's history).

Individuals with prior felony convictions (like Mr. Adame-Lopez) are, in short, included in "the people" identified in the Second Amendment. A restriction like § 922(g)(1) is unconstitutional as applied to them.

### 2. There is no historical tradition prohibiting felons from possessing firearms.

The government cannot meet its burden to establish the requisite historical analogues for § 922(g)(1). As with the restriction challenged in *Bruen*, § 922(g)(1) is unconstitutional.

The statute constitutes the first (and simplest) type of regulation under *Bruen*: a general-societal problem regulation. Like the urban-handgun-violence problem in *Bruen*, the "general societal problem" that § 922(g)(1) is designed to address—the purported risk from ex-felons accessing guns—is one "that has persisted since the 18th century." 142 S. Ct. at 2131. Thus, like any general-societal-problem regulation, § 922(g)(1) is presumptively unconstitutional unless the government "affirmatively prove[s]" a "comparable tradition" of "distinctly similar historical regulation." *Id.* at 2127, 2131, 2132.

There is no comparable historical tradition for § 922(g)(1). Neither the federal government nor a single state barred all people convicted of felonies until the 20th century.[4] *See, e.g.*, Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009). Indeed, § 922(g)(1) itself was adopted in 1968, 177 years after the Second Amendment was ratified. That timeline is too recent to have any value under *Bruen*. 142 S. Ct. at 2154 n.28 ("[L]ate-19th-century evidence" and all "20th-century evidence . . . does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence."). Blanket ex-felon dispossession of the sort at issue here is, in other words, a modern innovation—not a historical one.

---

[4] The first state law to bar the possession of some firearms by ex-felons was enacted in 1914. Catie Carberry, *Felons and Persons with a Mental Impairment*, Second Thoughts: A Blog from the Center for Firearms Law at Duke University (June 27, 2019), https://sites.law.duke.edu/secondthoughts/2019/06/27/miniseries-part-iii-felons-and-persons-with-a-mental-impairment/. And even this first law only banned possession of certain weapons.

11

Nor is § 922(g)(1) supported by any other regulatory tradition. To the contrary, it conflicts with the tradition in every period of relevant history identified in *Bruen*: "(1) . . . early modern England; (2) the American Colonies and the early Republic; (3) antebellum America [and] Reconstruction." 142 S. Ct. at 2135–36. And it also conflicts with (4) 20th-century history, too. None of these periods contain a sufficient § 922(g)(1) analogue. And without one, the statute fails under *Bruen*.

The government will therefore be unable to even attempt what the State of Hawaii did in *Teter*. Hawaii gave the Ninth Circuit a 278-page filing on historical tradition to try to justify its ban on possessing butterfly knives. *See* Supplemental Brief & Addendum of Defendants-Appellees, *Teter v. Lopez*, No. 20-15948, ECF No. 69 (9th Cir. Sept. 19, 2022). That submission started with a 51-page brief directly citing over 60 different laws, including dozens of bans on various kinds of knives—dirks, daggers, Bowie knives, Arkansas Toothpicks, sword-canes, etc.—spanning from 1837 to 1917. *Id.* It followed with a 227-page addendum providing the actual text of those laws. *Id.* And throughout that 278-page filing, Hawaii argued, with specific citations to specific statutes, that its dozens of proffered knife laws historically grounded its modern butterfly-knife ban. *E.g.*, *id.* at 14–34.

Hawaii lost. *Teter*, 76 F.4th at 954.

The government here will face an even steeper climb. It will be unable to offer any *Bruen*-relevant historical laws that regulate this sort of conduct "to a comparable degree," "with a comparable severity," and "with a comparable [level of] enforcement." *Baird*, 81 F.4th at 1047.

**IV.     Conclusion**

The Second Amendment's plain text protects the regulated conduct here. And the government will be unable to provide any tradition of distinctly-similar historical laws to justify the charge. So, this prosecution is unconstitutional under *Bruen*, *Teter*, and *Baird*. Mr. Adame-Lopez asks that it be dismissed.

Dated: December 15, 2023

**Rene L. Valladares**
Federal Public Defender

By: /s/ Allie Wilson
   **Allie Wilson**
Assistant Federal Public Defender
Attorney for **Esteban Adame-Lopez**

**CERTIFICATE OF ELECTRONIC SERVICE**

I certify that on December 15, 2023, I electronically filed the foregoing with the United States District Court for the District of Nevada by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. The following non-CM/ECF participants will be served by U.S. Mail: Esteban Adame-Lopez.

/s/Allie Wilson
Allie Wilson
Federal Public Defender Employee