JASON M. FRIERSON
United States Attorney
Nevada Bar No. 7709
MEGAN RACHOW
Nevada Bar No. 8231
ANDREW KEENAN
Assistant United States Attorneys
400 South Virginia, Suite 900
Reno, Nevada 89501
Phone: (775) 784-5438
Megan.Rachow@usdoj.gov
Andrew.Keenan@usdoj.gov

*Representing the United States of America*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:23-cr-00024-LRH-CLB |
| Plaintiff, | |
| vs. | **Government's Response to Defendant's Motion to Dismiss (ECF No. 17)** |
| ESTEBAN GERARDO ADAME-LOPEZ, | |
| Defendant. | |

Certification: This response is timely.

## INTRODUCTION

Defendant Esteban Gerardo Adame-Lopez ("Defendant") has been charged with one count of felon in possession of a firearm.  Defendant now moves this Court to dismiss the indictment against him on the basis that, under the Supreme Court's recent decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), his conduct is protected under the Second Amendment. Defendant's argument fails as nothing in *Bruen* casts doubt on the

constitutionality of 18 U.S.C. § 922(g)(1).[1]  Moreover, even if the Second Amendment's plain text did extend to such conduct, Section 922(g)(1) falls within the nation's long-standing tradition of disarming citizens who engage in criminal activity or are otherwise not law-abiding. The motion should be denied.

## RELEVANT BACKGROUND

In July 2023, a grand jury empaneled in the state and District of Nevada indicted Defendant on one count of felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). ECF 1. The indictment against Esteban Gerardo Adame-Lopez arises from events that occurred in June 2022, namely, his unlawful possession of firearm, despite his status as a felon. *Id.*

On June 17, 2023, at approximately 4:52 p.m., members of the Regional Gang Unit located and arrested Defendant in Reno, Nevada. *See* Exhibit 1.  At the time of his arrest, Defendant had an active warrant for failing to appear in Reno Justice Court on misdemeanor charges of Battery and Use/Possession of Drug Paraphernalia. *See* Exhibit 2. Defendant was known to the gang unit as a Norteno gang member and previously contacted by the gang unit multiple times. *See* Exhibit 3. On June 17, 2023, Defendant was detained and admitted to possessing a firearm, which was concealed on his waist. *Id.* Law enforcement recovered a loaded Taurus Millennium G2 9mm pistol from Defendant's waistband. *Id.* At the time Defendant possessed the loaded firearm, the defendant had a prior conviction for Attempted Battery with a Deadly Weapon Resulting in Substantial Bodily Harm from July 1, 2020.  Exhibit 4. Defendant, in pleading guilty to the attempted battery, admitted to being criminally responsible for shooting two individuals. *See* Exhibit 5. For that conviction, Defendant was sentenced to twenty-four to

---

[1] It is unclear whether Defendant is making a facial or as-applied Second Amendment challenge to § 922(g)(1).

sixty months imprisonment as part of a global disposition which also resolved a misdemeanor Domestic Battery offense. *See* Exhibit 4; Exhibit 5.

Defendant now argues that the Supreme Court's recent decision in *Bruen* renders 18 U.S.C. § 922(g)(1) unconstitutional. As set forth below, the defendant's *Bruen* motion is premised on a faulty reading of *Bruen* and other Second Amendment jurisprudence, as well as the misplaced assumption that the Second Amendment was intended to arm felons.

## ARGUMENT

Citing *Bruen*, the defense asks this Court to find that 18 U.S.C. § 922(g)(1)'s prohibition on felons possessing firearms is unconstitutional. At its heart, however, the defendant's *Bruen* motion is based on the Supreme Court's opinions in *Heller v. District of Columbia*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010). Contrary to the defendant's claims, *Bruen* did not usher in any meaningful change to the Supreme Court's approach to the "plain text" of the Second Amendment (*i.e.*, step one of the analysis) as it relates to the charges here. The defendant's claims are as meritless now as they were immediately following *Heller* and *McDonald*. Even if applying the framework recently clarified by *Bruen*, the defendant's challenge is clearly meritless as possessing a firearm while a felon is conduct outside the scope of the Second Amendment's protections. Moreover, even if the Court were to find otherwise, the prohibition on felons possessing firearms falls well within the nation's long-standing tradition of disarming citizens who engage in unlawful activity.

**A.    Defendant Fundamentally Misconstrues the Supreme Court's Second Amendment Jurisprudence.**

The defendant's attempt to wield the Supreme Court's Second Amendment jurisprudence, principally its decision in *Bruen*, as a sword against the Indictment is fundamentally at odds with Supreme Court precedent. When undertaking a faithful analysis of *Bruen* and the other Supreme

3

Court precedent on which it is based, the defendant's Second Amendment challenge to the charges in this case necessarily fail.

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *Heller*, the Supreme Court recognized that the Second and Fourteenth Amendments protect the right of law-abiding, responsible citizens to possess a handgun in the home for lawful purposes, like self-defense. 554 U.S. at 635. The *Heller* Court thus held unconstitutional two District of Columbia laws that effectively banned handgun possession in the home and required all firearms within homes to be kept inoperable and thus unavailable for self-defense. *Id*. at 628–34.

"Like most rights," however, the *Heller* Court emphasized that "the right secured by the Second Amendment is not unlimited." *Id*. at 626. It is "***not*** a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id*. (emphasis added). The *Heller* Court made clear that the opinion should not "be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id*. at 626–27.  Such regulations are "presumptively lawful." *Id*. at 627 n.26. Subsequently, in *McDonald*, a plurality of the Supreme Court "repeat[ed]" its "assurances" that *Heller*'s holding "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons." 561 U.S. at 786 (quoting *Heller*, 554 U.S. at 626).

In *Bruen*, the Supreme Court simply "made the constitutional standard endorsed in *Heller* more explicit." 142 S. Ct. at 2134. It elaborated on the test *Heller* and *McDonald* set forth to determine whether a government regulation infringes on the Second Amendment right to possess

1 and carry guns for self-defense, holding: "When the Second Amendment's plain text covers an

2 individual's conduct, the Constitution presumptively protects that conduct. The government

3 must **then** justify its regulation by demonstrating that it is consistent with the Nation's historical

4 tradition of firearm regulation." *Id*. at 2129–30 (emphasis added).

5       The *Bruen* Court recognized that the first step – *i.e.*, analyzing the "plain text" of the

6 Second Amendment and determining whether it covered the conduct in question – was "[i]n

7 keeping with *Heller*." *Id*. at 2126. However, the *Bruen* Court rejected the post-*Heller* test that had

8 developed among the circuit and district courts at the second step of the analysis, in which courts

9 applied so-called "means-end scrutiny" (*i.e.*, strict, or intermediate scrutiny) to laws that were

10 found to fall within the Second Amendment's "plain text." *Id*. at 2127. Instead, the Court held

11 that an analysis of the "Nation's historical tradition of firearm regulation," not means-end

12 scrutiny, was the appropriate standard at the second step. *Id*.

13       Applying this constitutional standard, the Court held unconstitutional a provision of New

14 York's licensing law that required an applicant to prove "proper cause exists" to obtain a license

15 to carry a gun outside his home. *Id. at* 2123. First, the Court held the Second Amendment's plain

16 text covered the conduct at issue. *Id*. at 2134–35.  The *Bruen* petitioners were "ordinary, law

17 abiding, adult citizens" who sought to carry handguns publicly for self-defense. *Id*. at 2134. Thus,

18 the Supreme Court concluded, they fell within "the right to keep and bear arms." *Id*. The Court

19 then surveyed historical data from "medieval to early modern England" through "the late-19th

20 and early-20th centuries" to determine whether the licensing law squared with historical

21 tradition. *Id*. at 2135–56. After a "long journey through the Anglo-American history of public

22 carry, [the Court] conclude[d] that respondents ha[d] not met their burden to identify an

23 American tradition justifying the State's proper-cause requirement." *Id*. at 2156. "Apart from a

24 few late-19th-century outlier jurisdictions," the Court summarized, American governments have

not "required law-abiding, responsible citizens to demonstrate a special need for self-protection distinguishable from that of the general community in order to carry arms in public." *Id.* (quotation marks omitted).

Although *Bruen* rejected the means-end scrutiny framework most courts had relied upon to assess the constitutionality of gun regulation (after first finding that the conduct at issue was covered by the Second Amendment), *id.* at 2127, it did not, as the defendant suggests, erase the two-step analysis entirely. *Bruen* also did not hold or even remotely imply that the Second Amendment protections extend to felons who wish to possess firearms. Rather, throughout the opinion and concurring opinions, the Court reinforced *Heller* and *McDonald*'s pronouncement that the Second Amendment belongs to "law-abiding" citizens only. 142 S. Ct. at 2122, 2124-25, 2131, 2133, 2134, 2138, 2150, 2156; *see also id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) ("'[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons.'") (*citing Heller*, 554 U.S. at 626). To the extent the concurrence by Justices Kavanaugh and Roberts joined the *Bruen* lead opinion on narrower grounds, their concurrence is binding. *Marks v. United States*, 430 U.S. 188, 193 (1977); *see also United States v. Davis*, 825 F.3d 1014, 1021-22 (9th Cir. 2016) (en banc).

Overall, *Bruen* defines the Second Amendment as belonging to "law-abiding" citizens 14 times. *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2122, 2125, 2131, 2133-34, 2135 n.8, 2138 & n.9, 2150, 2156 (2022). Consistent with that principle, while *Bruen* invalidated New York's "may-issue" licensing regime, it approved "shall-issue" regimes that "require applicants to undergo a background check or pass a firearms safety course." *Id.* at 2138 n.9; *see id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) ("[S]hall-issue licensing regimes are constitutionally permissible[] . . . ."). The Court explained that such regimes—many of which prohibit the issuance of licenses to felons— generally pass constitutional muster because they

"are designed to ensure only that those bearing arms . . . are, in fact 'law-abiding, responsible citizens.'" *Id.* at 2138 n.9 (majority op.) (quoting *Heller*, 554 U.S. at 635).

Defendant's reliance on *Teter* and *Baird* to characterize *Bruen* as a Second Amendment "gauntlet" is similarly misplaced. *See* Def. Mo. at 7-8. In *Teter v. Lopez*, the Ninth Circuit applied *Bruen* to a Hawaii statute banning butterfly knives without exception. 76 F.4th 938, 942 (9th Cir. 2023). The court ultimately found the possession of butterfly knives was conduct protected by the plain text of the Second Amendment and Hawaii did not demonstrate that the ban was consistent with the Nation's historical tradition of regulating arms because the proffered historical statutes regulated different conduct.[2] *Id.* at 950-51. In *Baird v. Bonta,* the Ninth Circuit remanded a case to conduct a proper preliminary injunction analysis related to California's general open-carry ban. 81 F.4th 1036, 1046 (9th Cir. 2023). The court directed the district court to apply the test outlined in *Bruen* by considering first whether the regulated conduct is covered by the text of the Second Amendment; if so, in applying *Bruen*, the court noted "California bears the burden to identify a 'well-established and representative historical analogue' to its open-carry ban that was in force when the Second or Fourteenth Amendment was ratified." *Id.* In essence, while *Teter* and *Baird* are illustrative of how the Ninth Circuit may apply *Bruen* to a blanket ban on butterfly knives or open carry, the cases in no way disturb prior Ninth Circuit and Supreme Court jurisprudence approving of felon disarmament.

/ / /

/ / /

/ / /

---

[2] Notably, because the Hawaii statute was "not limited to disarming criminals," the Ninth Circuit explicitly did not address "the question whether criminals are included among 'the people' referenced the Second Amendment's text." *Id.* at 949, n. 9.

**B.      Being a Felon in Possession of a Firearm or Ammunition Is Not Protected by the Second Amendment.**

The Indictment, which alleges that the defendant violated 18 U.S.C. § 922(g)(1), is not facially unconstitutional or unconstitutional as applied to the defendant.  First, the plain text of the Second Amendment does not protect the prohibited conduct: possessing a firearm as a convicted felon. Second, even assuming for the sake of argument that it did, § 922(g)(1) would still be constitutional because the statute is clearly consistent with the nation's long-standing historical tradition of disarming persons considered a risk to society.

**i.      The Second Amendment's Plain Text Does Not Encompass Felon Armament.**

It is well-established that the plain text of the Second Amendment does not guarantee a right to felon armament.  As explained above, in *Heller*, the Supreme Court defined the right protected by the Second Amendment as the right of "law-abiding, responsible citizens" to keep and bear arms for lawful purposes. 554 U.S. at 635. Consistent with that definition, the Court cautioned that "nothing in [its] opinion should be taken to cast doubt" on "longstanding prohibitions on the possession of firearms by felons." *Id*. at 626. The Court described these "permissible" measures as falling within "exceptions" to the protected right to bear arms. *Id*. at 635. In *McDonald*, a plurality of the Court "repeat[ed]" its "assurances" that *Heller* "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.'" 561 U.S. at 786 (quoting *Heller*, 554 U.S. at 626).

*Bruen* only reinforced the conclusion that the Second Amendment does not extend to possession of firearms by convicted felons.  The concurrence of Justices Kavanaugh and Roberts reiterated that "longstanding prohibitions on the possession of firearms by felons" are constitutional. 142 S. Ct. at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring); *see Marks v. United States*, 430 U.S. 188, 193 (1977). The lead opinion repeatedly described the scope of the

1    Second Amendment's protection as limited to lawful purposes by "law-abiding" citizens. *Bruen*,

2    142 S. Ct. at 2122, 2125, 2131, 2133, 2134, 2138, 2150, 2156, 2157, 2158, 2159, 2161. Again,

3    *Bruen* approved "'shall-issue" licensing regimes that "require applicants to undergo a background

4    check or pass a firearms safety course." *Id*. at 2138 n.9; *see id*. at 2162 (Kavanaugh, J., joined by

5    Roberts, C.J., concurring) ("[S]hall issue licensing regimes are constitutionally permissible[.]")).

6    Such regimes generally pass constitutional muster because they "are designed to ensure only that

7    those bearing arms . . . are, in fact 'law-abiding, responsible citizens.'" *Id*. at 2138 n.9. As

8    discussed above, this reasoning underscores that § 922(g)(1) – which aims to ensure that "those

9    bearing arms" are "law-abiding, responsible citizens" – accords with the Second Amendment.

10   *Id*.

11           Consistent with *Heller*, *McDonald*, and *Bruen*, the Ninth Circuit has also rejected similar

12   as-applied Second Amendment challenges to § 922(g)(1).  In *United States v. Vongxay*, the Ninth

13   Circuit held "that § 922(g)(1) does not violate the Second Amendment as it applies to . . . a

14   convicted felon," because "felons are categorically different from the individuals who have a

15   fundamental right to bear arms." 594 F.3d 1111, 1115, 1118 (9th Cir. 2010). Under *Vongxay*,

16   felons fall entirely outside the "class" protected by the Second Amendment; thus, barring their

17   possession of weapons is "presumptively lawful." *Id*. at 1115; *see also United States v. Phillips*, 827

18   F.3d 1171, 1174-75 (9th Cir. 2016) (rejecting, as foreclosed by *Vongxay*, a felon's Second

19   Amendment challenge to his § 922(g)(1) conviction based on nature of predicate felony).  *Vongxay*

20   further held that there is no constitutional difference between types of felons, explicitly declining

21   "to make a distinction between violent and non-violent felons." 594 F.3d at 1116. And *Phillips*

22   reaffirmed this principle. 827 F.3d at 1173-74.

23           *Bruen* did not abrogate *United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010). *See, e.g.,*

24   *United States v. Delpriore*, No. 18-cr-136, 2022 WL 17490771, at *2-*3 (D. Ak. Oct. 4, 2022); *United*

9

*States v. Siddoway*, 21-cr-205, 2022 WL 4482739, at \*1-\*2 (D. Id. Sept. 27, 2022); *United States v. Hill*, No. 21-cr-107, 2022 WL 4361917, at \*2-\*3 (S.D. Cal. Sep. 20, 2022); *United States v. Nevens*, No. 19-cr-774, 2022 WL 17492196, at \*2 (C.D. Cal. Aug. 15, 2022). The Ninth Circuit has "recognized that circuit precedent, authoritative at the time that it issued, can be effectively overruled by subsequent Supreme Court decisions that are closely on point, even though those decisions do not expressly overrule the prior circuit precedent." *Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003) (en banc) (internal quotations and citation omitted). A case can be effectively overruled when a higher court "undercut[s] the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." *Id.* at 900. "[T]he clearly irreconcilable requirement is a high standard." *Fed. Trade Comm'n v. Consumer Def., LLC*, 926 F.3d 1208, 1213 (9th Cir. 2019) (quoting *Rodriguez v. AT & T Mobility Servs. LLC*, 728 F.3d 975, 979 (9th Cir. 2013)). "Although [courts] should consider the intervening authority's reasoning and analysis, as long as [a court] can apply our prior circuit precedent without running afoul of the intervening authority, [it] must do so." *Lair v. Bullock*, 697 F.3d 1200, 1207 (9th Cir. 2012) (quoting *United States v. Orm Hieng*, 679 F.3d 1131, 1140 (9th Cir. 2012)).

Ninth Circuit law rejecting as-applied challenges to § 922(g)(1) comports with the observation by multiple Justices in the *Bruen* majority that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring); *id.* at 2157 (Alito, J., concurring). Accordingly, because this Court can "apply [Ninth Circuit] precedent consistently with that of the higher authority, [it] must do so." *Fed. Trade Comm'n,* 926 F.3d at 1213.

The four corners of the indictment make clear that the defendant is both non-law-abiding and dangerous because he has been convicted of a felony attempted battery with a deadly weapon causing substantial bodily harm. The nature of this prior conviction demonstrates a history of

felony-level violence involving a firearm, specifically the shooting of another person. The facts of the instant case show that, despite prior convictions for misdemeanor domestic battery and felony attempted battery with a deadly weapon, as well as an active bench warrant related to a misdemeanor battery case, Defendant has continued to illegally possess a loaded firearm. In short, Defendant, who is not a law-abiding citizen, has not shown that his illegal conduct is covered by the plain text of the Second Amendment, and thus has not shown and cannot show that § 922(g)(1) is subject to a historical tradition analysis.  On this ground alone, the Court should deny his motion.

    **ii.**    **Section 922(g) Is Consistent with Long-Standing Tradition.**

Even if the Supreme Court had not already defined the Second Amendment in a way that excludes any right of convicted felons to possess firearms, the historical record supports the conclusion that Section 922(g)(1)'s restriction of firearm possession by felons is "consistent with the Nations' historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130.

Defendant essentially takes the position that the government must show that there was a substantively identical criminal prohibition in place at the instant that the Second Amendment was ratified. But this is not the inquiry *Bruen* prescribes. On the contrary, the appropriate "analogical reasoning under the Second Amendment is [not] a regulatory straightjacket . . . analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin." *Bruen*, 142 S. Ct. at 2133. That historical inquiry often simply involves "reasoning by analogy—a commonplace task for any lawyer or judge." *Id.* at 2132.

This manner of analysis makes sense because there are sound and sensible "modern regulations that were unimaginable at the founding." *Id.* at 2132. For instance, in the early days of the Republic, most serious offenses (including murder and robbery) carried a mandatory death

sentence. *See, e.g.*, Crimes Act of 1790 §§ 3 and 8-10, 1 Stat. 113-114. Because these crimes were already punishable by the most severe penalty possible, it would have been nonsensical to enact a separate statute providing for a collateral consequence, such as forfeiting firearm rights of a man sentenced to death. Thus, the failure to create an equivalent of § 922(g) at the time the Second Amendment was adopted is not evidence that the Second Amendment forbade doing so.

Contrary to the defendant's assertion, it does not matter that the felon-in-possession statutes are "of mid-20th century vintage." *See Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 196 (5th Cir. 2012), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111. As the *Bruen* Court made clear by reaffirming what was already explicit in *Heller*, there have existed in this country "longstanding prohibitions on the possession of firearms by felons." *See Heller*, 554 U.S. at 626, 128 S.Ct. 2783. *Heller*'s point in endorsing felon-in-possession laws was not that they had existed in their modern form since the nation's founding, but that they were analogous enough to historical regulations to be deemed "longstanding." *See* 544 U.S. at 626–27. And indeed, well-established, and representative historical *analogues* to § 922(g) have existed throughout the nation's history.

For centuries, the gun rights of certain groups have been categorically limited to promote public safety. Thomas M. Cooley's 1868 treatise, which *Heller* described as "massively popular," 554 U.S. at 616, explained that some classes of people were "almost universally excluded" from exercising certain civic rights, including "the idiot, the lunatic, and ***the felon***, on obvious grounds." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 29 (1st ed. 1868) (emphasis added). The Second Amendment incorporates "a common-law tradition that permits restrictions directed at citizens who are not law-abiding and responsible" and "'does not preclude laws disarming the unvirtuous (i.e. criminals).'" *United States v. Bena*, 664 F.3d 1180, 1183–84 (8th Cir. 2011) (quoting Don B.

Kates, Jr., *The Second Amendment: A Dialogue, Law & Contemp. Probs.*, Winter 1986 at 146 (1986));
*see also United States v. Rene E.*, 583 F.3d 8, 15–16 (1st Cir. 2009) ("'Perhaps the most accurate way to describe the dominant understanding of the right to bear arms in the Founding era is as a civic right . . . limited to those members of the polity who were deemed capable of exercising it in a virtuous manner." (Quoting Saul Cornell, "Don't Know Much About History": The Current Crisis in Second Amendment Scholarship, 29 N. Ky. L. Rev. 657, 679 (2002))).

In addition to felons falling outside the scope of the Second Amendment's protection of the right of law-abiding, responsible citizens to possess firearms, a comprehensive review of historical tradition confirms legislatures' authority to prohibit felons from possessing firearms. Beginning in England and lasting at least through the founding era, history is replete with "representative historical analogue[s]" for Section 922(g)(1) that shed light on the scope of the Second Amendment and the power of legislatures. *Bruen*, 142 S. Ct. at 2133-34 (emphasis omitted). Two types of historical laws are particularly pertinent: (a) laws categorically disqualifying groups from possessing firearms based on a judgment that the group could not be trusted to adhere to the rule of law; and (b) laws authorizing capital punishment and estate forfeiture for felonies. By the time of the Second Amendment's ratification in 1791, there was an established tradition of legislatures exercising broad authority to categorically disqualify people from possessing firearms based on a judgment that certain individuals could not be trusted to adhere to the rule of law.

First, because the Second Amendment "'codified a right inherited from our English ancestors,'" English legal tradition sheds light on the scope of the "'right secured by the Second Amendment'"—which, as with the English right, "'is not unlimited.'" *Bruen*, 142 S. Ct. at 2127-28 (quoting *Heller*, 554 U.S. at 599, 626). Among the limits well-established in England was the authority to disarm classes of people who, in the legislature's view, could not be depended upon

13

1  to obey the rule of law. *See, e.g.,* 1 W. & M., Sess. 1, c. 15, in 6 The Statutes of the Realm 71-73

2  (1688) (codifying an "Act for the better securing the Government by disarming Papists and

3  reputed Papists," which provided that any Catholic who refused to make a declaration

4  renouncing his or her faith could not "have or keep in his House or elsewhere" any "Arms[,]

5  Weapons[,] Gunpowder[,] or Ammunition (other than such necessary Weapons as shall be

6  allowed to him by Order of the Justices of the Peace . . . for the defense of his House or person").

7  This example is particularly relevant because the same Parliament "wr[ote] the 'predecessor to

8  our Second Amendment' into the 1689 English Bill of Rights," which similarly drew a religion-

9  based distinction, among other limitations. *Bruen*, 142 S. Ct. at 2141 (quoting *Heller*, 554 U.S. at

10  593); *see* 1 W. & M., Sess. 2, c. 2, in 6 The Statutes of the Realm 143 (1688) (specifying that

11  "Protestants may have Arms for their Defense suitable to their Conditions and as allowed by

12  Law").

13       The American colonies inherited the English tradition of broad legislative authority to

14  disarm classes of people who were viewed as not dependable adherents to the rule of law.

15  Massachusetts, for example, disarmed the supporters of preacher Anne Hutchinson in the 1630s

16  not because of a demonstrated propensity for violence, but because of their lack of fealty to the

17  rule of law. *See Range v. Att'y Gen. United States,* 53 F.4th 262, 266 (3d Cir. 2022)*, reh'g en banc*

18  *granted, opinion vacated sub nom. Range v. Att'y Gen. United States of Am.,* 56 F.4th 992 (3d Cir. 2023)*,*

19  *and on reh'g en banc sub nom. Range v. Att'y Gen. United States of Am.,* 69 F.4th 96 (3d Cir. 2023)

20  (collecting historical scholarship).[3] To take another example, during the French and Indian War,

21  Virginia imported the English tradition of disarming Catholics who refused to take a loyalty oath.

22

23

24           [3] While the panel opinion in *Range* has been vacated, the historical scholarship retains persuasive value.

14

1    *See* 7 The Statutes at Large; Being A Collection of All the Laws of Virginia 35-39 (1820) (1756

2    Va. law).

3          Over the course of the Revolutionary War, American legislatures passed numerous laws

4    disarming individuals because their actions demonstrated "an unwillingness to comply with the

5    legal norms of the nascent social compact—often specifically targeting those who failed to

6    demonstrate loyalty to the emergent American government." *See Range v. Att'y Gen.*, 53 F.4th at

7    277, *opinion vacated*, 69 F.4th 96 (3d Cir. 2023). An early example is a 1775 Connecticut law

8    providing that any person convicted of "libel[ing] or defam[ing]" any acts or resolves of the

9    Continental Congress or the Connecticut General Assembly "made for the defense or security of

10    the rights and privileges" of the colonies "shall be disarmed and not allowed to have or keep any

11    arms." The Public Records of the Colony of Connecticut from May 1775 to June 1776, at 1993

12    (1890) (1775 Conn. law). In 1776, the Continental Congress recommended that the colonial

13    governments disarm those who were "notoriously disaffected to the cause of America" or who

14    simply "have not associated" with the colonial governments in the war effort. 4 Journals of the

15    Continental Congress 1774-1789, at 205 (1906) (resolution of March 14, 1776). At least six of the

16    governments enacted legislation in this vein, requiring oaths of loyalty to the government and to

17    strip anyone who failed or refused to take the oath of the right to bear arms. *See* 5 The Acts and

18    Resolves, Public and Private, of the Province of the Massachusetts Bay 479-84 (1886) (1776 Mass.

19    law); 7 Records of the Colony of Rhode Island and Providence Plantations in New England 567

20    (1862) (1776 R.I. law); 1 The Public Acts of the General Assembly of North Carolina 231 (1804)

21    (1777 N.C. law); Acts of the General Assembly of the State of New-Jersey at a Session Begun on

22    the 27th Day of August, 1776, at 90 (1777) (1777 N.J. law); 9 The Statutes at Large of

23    Pennsylvania from 1682 to 1801, at 112-13 (1903) (1777 Pa. law); 9 The Statutes at Large; Being

24    A Collection of All the Laws of Virginia 282 (1821) (1777 Va. law). Many of these laws provided

1    that failing or refusing to take the oath resulted in forfeiture of a bundle of additional political

2    rights, including the rights to vote, to serve on juries, and to hold public office—further

3    reinforcing the longstanding connection between armsbearing and these related rights. *See, e.g.*,

4    1776 Mass. law at 481; 1777 N.C. law at 231; 1777 Pa. law at 112-13; 1777 Va. law at 282.[4]

5        The Constitution's ratification debates support this understanding of the Amendment's

6    text. Indeed, the historical background of the Second Amendment's adoption provides

7    particularly persuasive evidence that the founders understood that the constitutional right to bear

8    arms is compatible with broad legislative authority to disarm groups legislatures did not trust to

9    follow the law. A Pennsylvania proposal, which *Heller* called "highly influential" and referred to

10   as a "Second Amendment precursor[]," 554 U.S. at 604, provided for an amendment

11   guaranteeing the right to bear arms "unless for crimes committed, or real danger of public injury."

12   *Bena*, 664 F.3d at 1184 (quoting 2 Bernard Schwartz, The Bill of Rights: A Documentary History

13   662, 665 (1971)) (emphasis omitted). And in New Hampshire, the convention recommended an

14   amendment providing that "Congress shall never disarm any Citizen unless such as are or have

15   been in *Actual Rebellion.*" *Folajtar v. Att'y Gen. of the United States*, 980 F.3d 897, 908 (3d Cir. 2020)

16   (citing 1 *Debates in the Several State Conventions on the Adoption of the Federal Constitution* 326

17   (Jonathan Elliott ed., 2d ed. J.B. Lippincott 1891)). These proposals recognize the prevailing

18   historical tradition of broad legislative power to disarm people who fell outside the trustworthy,

19   _____

20   [4] The Pennsylvania law is particularly informative because the year before enacting it,
     Pennsylvania became one of the first states to adopt a state constitutional provision protecting
21   an individual right to bear arms. *Heller*, 554 U.S. at 601; *see* Pa. Declaration of Rights of 1776 §
     XIII, in The Complete Bill of Rights: The Drafts, Debates, Sources, And Origins 278 (Neil
22   Cogan ed., Oxford University Press 2d ed., 2014); *see also* N.C. Declaration of Rights of 1776 §
     XVII, in The Complete Bill of Rights, *supra*, at 277-78 (individual rights-based constitutional
23   provision adopted the year before the North Carolina disarmament law cited above); Mass.
     Const. of 1780, pt. I, art. XVII, in The Complete Bill of Rights, *supra*, at 277 (individual rights-
24   based constitutional provision adopted four years after the Massachusetts disarmament law
     cited above).

1    law-abiding citizenry—so the proposals cannot be "shoehorn[ed] . . . into the silo of

2    dangerousness." *Id.* at 908-09 (3d Cir. 2020).[5]

3        Capital punishment and forfeiture of estate were also commonly authorized punishments

4    in the American colonies (and then the states) up to the time of the founding. *Folajtar*, 980 F.3d

5    at 904-05. Capital punishment for felonies was "ubiquit[ous]" in the late eighteenth century and

6    was "'the standard penalty for all serious crimes.'" *See Baze v. Rees*, 553 U.S. 35, 94 (2008)

7    (Thomas, J., joined by Scalia, J., concurring in the judgment) (quoting Stuart Banner, The Death

8    Penalty: An American History 23 (2002)). Indeed, the First Congress (which drafted and

9    proposed the Second Amendment) made a variety of felonies punishable by death, including not

10   only offenses like treason, murder on federal land, and piracy on the high seas, but also non-

11   violent conduct relating to forging or counterfeiting a public security. *See* An Act for the

12   Punishment of Certain Crimes Against the United States, 1 Stat. 112-15 (1790). States in the early

13   Republic likewise treated "nonviolent crimes such as forgery and horse theft" as "capital

14   offenses." *Medina v. Whitaker,* 913 F.3d 152, 159 (D.C. Cir. 2019); *see Banner*, *supra*, at 18

15   (referring to specific examples of individuals in Georgia who "escaped from jail after being

16   condemned to death" for "forgery" or "horsestealing"). And many American jurisdictions up

17   through the end of the 1700s authorized complete forfeiture of a felon's estate. *See* Beth A.

18   Colgan, Reviving the Excessive Fines Clause, 102 Cal. L. Rev. 277, 332 & nn.275-276 (2014)

19   _____

20   [5] The Second Amendment as adopted does not include the same language as these proposals.
     But it would have been "obvious" to the founders that certain groups, including (but not

21   necessarily limited to) "the felon," Cooley, *supra*, at 29, could properly be subject to
     disarmament laws consistent with the "pre-existing right" that was "codified" in the Second

22   Amendment, *Bruen*, 142 S. Ct. at 2127 (quoting Heller, 554 U.S. at 592). *See also* Akhil Reed
     Amar, The Bill of Rights 48 (1998); Stephen P. Halbrook, The Founders' Second Amendment:

23   Origins of the Right to Bear Arms 273 (2008) (explaining that founding-era proponents of a
     constitutional right to bear arms "did not object to the lack of an explicit exclusion of criminals

24   from the individual right to keep and bear arms" during the debates over "what became the
     Second Amendment," because this limitation "was understood").

(citing statutes); *see also, e.g.*, 2 Laws of the State of New York Passed at the Sessions of the Legislature (1785- 1788), at 664-65 (1886) (1788 N.Y. law) (providing for the death penalty for crimes including counterfeiting among other crimes); 9 The Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature 302-03 (1821) (1777 Va. forgery law) (providing that forgers and counterfeiters "shall be deemed and holden guilty of felony, shall forfeit his whole estate, real and personal, shall receive on his bare back, at the public whipping post, thirty nine lashes, and shall serve on board some armed vessel in the service of this commonwealth, without wages, for a term not exceeding seven years"); A Digest of the Laws of Maryland 255-56 (1799) (collecting Maryland forgery laws enacted between 1776 and 1778, each of which provided that those convicted "shall suffer death as a felon, without benefit of clergy"); *see generally Medina*, 913 F.3d at 158 ("[I]t is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms.").

As the Ninth Circuit has observed, most scholars of the Second Amendment agree "that the right to bear arms was 'inextricably . . . tied to' the concept of a 'virtuous citizen[ry]' that would protect society through 'defensive use of arms against criminals, oppressive officials, and foreign enemies alike,' and that 'the right to bear arms does not preclude laws disarming the unvirtuous citizens (i.e. criminals).'" *Vongxay*, 594 F.3d at 1118 (quoting Don B. Kates, Jr., *The Second Amendment: A Dialogue* at 146, and Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461, 480 (1995)). [6] "Felons 'were excluded from the right to arms'

---

[6] *Vongxay* acknowledges that scholars disagree on whether common law supports bans on felon gun possession. 594 F.3d at 1118 (citing C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 714–28 (2009)). However, as demonstrated throughout, the historical evidence establishes that felons have always been subject to limitations and prohibitions on their right to possess firearms.

because they were deemed unvirtuous." *United States v. Carpio-Leon*, 701 F.3d 974, 979-80 (4th Cir. 2012) (quoting Reynolds, *A Critical Guide to the Second Amendment* at 480).

Again, historical records support this conclusion. "*Heller* identified as a 'highly influential' 'precursor' to the Second Amendment the Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (quoting 554 U.S. at 604). That report recognized the permissibility of imposing a firearms disability on convicted criminals and made no distinction as to the type of criminal, stating that "citizens have a personal right to bear arms '***unless for crimes committed***, or real danger of public injury.'" *Id.* (quoting 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 662, 665 (1971)) (emphasis added). Similarly, Samuel Adams offered an amendment at the Massachusetts convention to ratify the Constitution, recommending "that the said Constitution be never construed to authorize Congress . . . to prevent the people of the United States, who are peaceable citizens, from keeping their own arms." Schwartz, *The Bill of Rights* at 674–75, 681. In the same vein, "[m]any of the states, whose own constitutions entitled their citizens to be armed, did not extend this right to persons convicted of crime." *Skoien*, 614 F.3d at 640.

In this respect, the right to bear arms is analogous to other civic rights that have historically been subject to forfeiture by individuals convicted of crimes, including the right to vote;[7] the right to serve on a jury;[8] and the right to hold public office.[9] Just as Congress and the States have required persons convicted of felonies to forfeit other civic rights, § 922(g)(1) permissibly imposes a firearms and ammunition disability "as a legitimate consequence of a felony conviction." *Tyler*

---

[7] *Richardson v. Ramirez*, 418 U.S. 24, 56 (1974).
[8] 28 U.S.C. § 1865(b)(5).
[9] *Spencer v. Kemna*, 523 U.S. 1, 8-9 (1998).

1    *v. Hillsdale Cty. Sherriff's Dep't*, 837 F.3d 678, 708 (6th Cir. 2016) (en banc) (Sutton, J., concurring

2    in judgment); *see also, e.g., United States v. Rice*, No. 3:22-CR-36, 2023 WL 2560836, at *7 (N.D.

3    Ind. Mar. 17, 2023) ("[I]t is hard to reconcile how the Framers of the Constitution could conclude

4    that felons could not be trusted to wield pens in voting booths or jury rooms, but they

5    simultaneously found them capable of wielding arms in the public square.").

6         Relying on the historical record, only one court of appeals has sustained an *as-applied*

7    challenge to § 922(g)(1) as to an individual convicted of a crime labeled and punishable as a

8    felony.[10] *See Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) (en banc). Citing that case,

9

---

10   [10] On the other hand, at least two courts of appeals and over 120 district-court decisions have rejected challenges to § 922(g)(1).  *See United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023); *Vincent v. Garland*, 80 F.4th 1197 (10th Cir. 2023); *United States v. Oliver,* No. 2:22-CR-319-RDP-NAD, 2023 WL 7115572 (N.D. Ala. Oct. 27, 2023)*; United States v. Bazile,* No. CR 23-34, 2023 WL 7112833 (E.D. La. Oct. 27, 2023)*; United States v. Hardy,* No. 23 CR 129, 2023 WL 6795591 (N.D. Ill. Oct. 13, 2023)*; United States v. Greene,* No. 3:23CR72 (RCY), 2023 WL 6149882 (E.D. Va. Sept. 20, 2023)*; United States v. Sternquist,* No. 22-CR-473(DLI), 2023 WL 5935805 (E.D.N.Y. Sept. 12, 2023)*; United States v. Saba,* No. 1:22-CR-00248-AKB, 2023 WL 5333255 (D. Idaho Aug. 17, 2023); *United States v. Ray,* No. CR 3:21-00057, 2023 WL 4378152 (S.D.W. Va. July 6, 2023)*; United States* v. *Pena*, No. 2:22-cr-366, Dkt. No. 95 (C.D. Cal. Mar. 21, 2023); *United States* v. *Hoeft*, No. 4:21-cr-40163, Dkt. No. 103 (D. S.D. Mar. 21, 2023); *United States* v. *Davis*, No. 1:23-cr-10018, Dkt. No. 49 (D. Mass. Mar. 17, 2023); *United States* v. *Rice*, No. 3:22-cr-36, Dkt. No. 40 (N.D. Ind. Mar. 17, 2023); *United States* v. *Davis*, No. 1:21-cr-206, Dkt. No. 86 (E.D. Cal. Mar. 14, 2023); *United States* v. *Kilgore*, No. 1:21-cr-277, Dkt. No. 40 (E.D. Cal. Mar. 14, 2023); *United States* v. *Lindsey*, No. 4:22-cr-138, Dkt. No. 25 (S.D. Iowa Mar. 10, 2023); *United States* v. *Tribble*, No. 2:22-cr-85, Dkt. No. 48 (N.D. Ind. Mar. 10, 2023); *Leonard* v. *United States*, No. 1:22-cv-22670, Dkt. No. 15 (S.D. Fla. Mar. 10, 2023); *United States* v. *Therrien*, No. 1:21-cr-10323 (D. Mass. Mar. 6, 2023); *United States* v. *Price*, No. 1:19-cr-824, Dkt. No. 105 (N.D. Ill. Mar. 3, 2023); *United States* v. *Belin*, No. 1:21-cr-10040, Dkt. No. 65 (D. Mass. Mar. 2, 2023); *United States* v. *Clark*, No. 1:20-cr-49, Dkt. No. 61 (N.D. Ind. Mar. 2, 2023); *United States* v. *Braster*, No. 1:20-cr-66, Dkt. No. 42 (N.D. Ind. Mar. 2, 2023); *United States* v. *Barnes*, No. 1:22-cr-43, Dkt. No. 42 (S.D.N.Y. Feb. 28, 2023); *United States* v. *Beard*, No. 4:22-cr-92, Dkt. No. 58 (S.D. Tex. Feb. 27, 2023); *United States* v. *Smith*, No. 2:22-cr-20351, Dkt. No. 35 (E.D. Mich. Feb. 24, 2023); *United States* v. *Barber*, No. 3:22-cr-65, Dkt. No. 58 (D. Ak. Feb. 21, 2023); *United States* v. *Ross*, No. 2:22-cr-20049, Dkt. No. 34 (E.D. Mich. Feb. 15, 2023); *United States* v. *Price*, No. 1:21-cr-164, Dkt. No. 122 (N.D. Ill. Feb. 13, 2023); *United States* v. *Gleaves*, No. 3:22-cr-14, Dkt. No. 116 (M.D. Tenn. Feb. 6, 2023); *United States* v. *Bacchus*, No. 2:22-cr-450, Dkt. No. 120 (C.D. Cal. Feb. 2, 2023); *United States* v. *Isaac*, No. 5:22-cr-117, Dkt. No. 27, 2023 WL 1415597 (N.D. Ala. Jan. 31, 2023); *United States* v. *Taylor*, No. 3:22-cr-22, Dkt. No. 32, 2023 WL 1423725 (E.D. Ky.

1

2    Jan. 31, 2023); *United States* v. *Barber*, No. 4:20-cr-384, Dkt. No. 118, 2023 WL 1073667 (E.D.
Tex. Jan. 27, 2023); *United States* v. *Hester*, No. 1:22-cr-20333, Dkt. No. 39 (S.D. Fla. Jan. 27,

3    2023); *United States* v. *Brown*, No. 2:20-cr-260, Dkt. No. 186, 2023 WL 424260 (E.D. Pa. Jan. 26,
2023); *United States* v. *Rush*, No. 4:22-cr-40008, Dkt. No. 46, 2023 WL 403774 (S.D. Ill. Jan. 25,

4    2023); *Davis* v. *United States*, No. 5:22-cv-224, Dkt. No. 1, 2023 WL 373172 (E.D. Ky. Jan. 24,
2023); *Battles* v. *United States*, No. 4:23-cv-63, Dkt. No. 2, 2023 WL 346002 (E.D. Mo. Jan. 20,

5    2023); *United States v. Gordon*, No. 1:14-cr-312, Dkt. No. 170, 2023 WL 336137 (N.D. Ga. Jan.
20, 2023); *Shipley v. Hijar*, No. 3:23-cv-11, Dkt. No. 3, 2023 WL 353994 (W.D. Tex. Jan. 20,

6    2023); *United States* v. *Smith*, No. 2:19-cr-505, Dkt. No. 183 (C.D. Cal. Jan. 19, 2023); *United
States* v. *Serrano*, No. 3:21-cr-1590, Dkt. No. 65 (S.D. Cal. Jan. 17, 2023); *United States* v. *Tucker*,

7    No. 2:22-cr-17, Dkt. No. 30, 2023 WL 205300 (S.D. W.Va. Jan. 17, 2023); *United States* v.
*Robinson*, No. 4:22-cr-70, Dkt. No. 39, 2023 WL 214163 (W.D. Mo. Jan. 17, 2023); *United States*

8    v. *Whittaker*, No. 1:22-cr-272, Dkt. No. 33 (D.D.C. Jan. 12, 2023); *United States* v. *Spencer*, No.
2:22-cr-561, Dkt. No. 24 (S.D. Tex. Jan. 12, 2023); *United States* v. *Garrett*, No. 1:18-cr-880, Dkt.

9    No. 144 (N.D. Ill. Jan. 11, 2023); *United States* v. *Moore*, No. 3:20-cr-474, Dkt. No. 100, 2023 WL
154588 (D. Or. Jan. 11, 2023); *United States* v. *Jordan*, No. 3:22-cr-1140, Dkt. No. 39, 2023 WL

10   157789 (W.D. Tex. Jan. 11, 2023); *Campiti* v. *Garland*, No. 3:22-cv-177, Dkt. No. 27 (D. Conn.
Jan. 10, 2023); *United States* v. *Coleman*, No. 3:22-cr-8, Dkt. No. 117, 2023 WL 122401 (N.D.

11   W.Va. Jan. 6, 2023); *United States* v. *Medrano*, No. 3:21-cr-39, Dkt. No. 65, 2023 WL 122650
(N.D. W.Va. Jan. 6, 2023); *United States* v. *Olson*, No. 1:22-cr-20525, Dkt. No. 33 (S.D. Fla. Jan.

12   5, 2023); *United States v. Good*, No. 1:21-cr-180, 2022 WL 18107183 (W.D. Mo. Nov. 18, 2022),
report and recommendation adopted, 2023 WL 25725 (W.D. Mo. Jan. 3, 2023); *United States v.*

13   *Wondra*, No. 1:22-cr-99, 2022 WL 17975985 (D. Idaho Dec. 27, 2022); *United States v. Jones*, No.
5:22-cr-376, Dkt. No. 59 (W.D. Okla. Dec. 23, 2022); *United States v. Williams*, No. 1:21-cr-362,

14   2022 WL 17852517 (N.D. Ga. Dec. 22, 2022); *United States v. Dawson*, No. 3:21-cr-293, 2022 WL
17839807 (W.D.N.C. Dec. 21, 2022); *United States v. Goins*, No. 5:22-cr-91, Dkt. No. 32 (E.D.

15   Ky. Dec. 21, 2022); *United States v. Mugavero*, No. 3:22-cr-1716, Dkt. No. 29 (S.D. Cal. Dec. 19,
2022); *United States* v. *Roux*, No. 1:22-cr-19 (D. N.H. Dec. 16, 2022); *United States v. Hunter*, No.

16   1:22-cr-84, 2022 WL 17640254 (N.D. Ala. Dec. 13, 2022); *United States v. Spencer*, No. 2:22-cr-
106, 2022 WL 17585782 (E.D. Va. Dec. 12, 2022); *United States v. Dotson*, No. 3:22-cr-1502, Dkt.

17   No. 26 (S.D. Cal. Dec. 12, 2022); *United States* v. *Tran*, No. 3:22-cr-331, Dkt. No. 63 (S.D. Cal.
Dec. 12, 2022); *United States* v. *Fencl*, No. 3:21-cr-3101, Dkt. No. 81 (S.D. Cal. Dec. 7, 2022);

18   *United States* v. *Perez-Garcia*, No. 3:22-cr-1581, Dkt. No. 70 (S.D. Cal. Dec. 6, 2022); *United States*
v. *Walker*, No. 2:19-cr-234, Dkt. No. 83 (E.D. Cal. Dec. 6, 2022); *United States v. Grinage*, No.

19   5:21-cr-399, Dkt. No. 51, 2022 WL 17420390 (W.D. Tex. Dec. 5, 2022); *United States v. Wagoner*,
No. 4:20-cr-18, Dkt. No. 262, 2022 WL 17418000 (W.D. Va. Dec. 5, 2022); *United States* v. *Gay*,

20   No. 4:20-cr-40026, Dkt. No. 412 (C.D. Ill. Dec. 5, 2022); *Shelby-Journey-Egnis* v. *United States*,
No. 2:21-cr-20535, Dkt. No. 53 (E.D. Mich. Dec. 5, 2022); *United States* v. *Glaze*, No. 5:22-cr-

21   425, Dkt. No. 23 (W.D. Okla. Dec. 1, 2022); *United States* v. *Ford*, No. 4:21-cr-179, Dkt. No. 52,
2022 WL 17327499 (W.D. Mo. Nov. 29, 2022); *United States* v. *Jones*, No. 4:20-cr-354, Dkt. No.

22   78, 2022 WL 17327498 (W.D. Mo. Nov. 29, 2022); *United States* v. *Jacobs*, No. 2:22-cr-160, Dkt.
No. 28 (C.D. Cal. Nov. 28, 2022); *United States* v. *Cage*, No. 3:21-cr-68, Dkt. No. 41, 2022 WL

23   17254319 (S.D. Miss. Nov. 28, 2022); *United States* v. *Willis*, No. 1:22-cr-186, Dkt. No. 36 (D.
Colo. Nov. 23, 2022); *United States* v. *Teerlink*, No. 2:22-cr-24, Dkt. No. 33, 2022 WL 17093425

24   (D. Utah Nov. 21, 2022); *United States* v. *Brunson*, No. 3:22-cr-149, Dkt. No. 66 (S.D. Cal. Nov.

21

18, 2022); *United States* v. *Hill*, No. 4:22-cr-249, Dkt. No. 42 (S.D. Tex. Nov. 17, 2022); *United States* v. *Blackburn*, No. 1:22-cr-209, Dkt. No. 28 (M.D. Pa. Nov. 17, 2022); *United States* v. *Mitchell*, No. 1:22-cr-111, Dkt. No. 43 (S.D. Ala. Nov. 17, 2022); *United States* v. *Dumont*, No. 1:22-cr-53 (D. N.H. Nov. 14, 2022); *United States* v. *Baker*, No. 2:20-cr-301, Dkt. No. 179, 2022 WL 16855423 (D. Utah Nov. 10, 2022); *United States* v. *Carpenter*, No. 1:21-cr-86, Dkt. No. 38, 2022 WL 16855533 (D. Utah Nov. 10, 2022); *United States* v. *Gray*, No. 1:22-cr-247, Dkt. No. 22, 2022 WL 16855696 (D. Colo. Nov. 10, 2022); *United States* v. *Moore*, No. 2:21-cr-121, Dkt. No. 81 (W.D. Pa. Nov. 9, 2022); *United States* v. *Reese*, No. 2:19-cr-257, Dkt. No. 193 (W.D. Pa. Nov. 8, 2022); *United States* v. *Young*, No. 2:22-cr-54, Dkt. No. 47 (W.D. Pa. Nov. 7, 2022); *United States* v. *Butts*, No. 9:22-cr-33, Dkt. No. 33 (D. Mont. Oct. 31, 2022); *United States* v. *Burton*, No. 3:22-cr-362, Dkt. No. 48 (D. S.C. Oct. 28, 2022); *United States* v. *Carleson*, No. 3:22-cr-32, Dkt. No. 39 (D. Ak. Oct. 28, 2022); *United States* v. *Grant*, No. 3:22-cr-161, Dkt. No. 44, 2022 WL 16541138 (D. S.C. Oct. 28, 2022); *Walker* v. *United States*, No. 3:20-cv-31, Dkt. No. 16, 2022 WL 16541183 (S.D. Cal. Oct. 28, 2022); *United States* v. *Law*, No. 2:20-cr-341, Dkt. No. 60 (W.D. Pa. Oct. 27, 2022); *United States* v. *Borne*, No. 1:22-cr-83, Dkt. No. 35 (D. Wyo. Oct. 24, 2022); *United States* v. *Minter*, No. 3:22-cr-135, Dkt. No. 33 (M.D. Pa. Oct. 18, 2022); *United States* v. *Melendrez-Machado*, No. 3:22-cr-634, Dkt. No. 32, --- F. Supp. 3d ----, 2022 WL 17684319 (W.D. Tex. Oct. 18, 2022); *United States* v. *Raheem*, No. 3:20-cr-61, Dkt. No. 389, 2022 WL 10177684 (W.D. Ky. Oct. 17, 2022); *United States* v. *Ridgeway*, No. 3:22-cr-175, Dkt. No. 32, 2022 WL 10198823 (S.D. Cal. Oct. 17, 2022); *United States* v. *Trinidad*, No. 3:21-cr-398, Dkt. No. 99, 2022 WL 10067519 (D.P.R. Oct. 17, 2022); *United States* v. *Carrero*, No. 2:22-cr-30, Dkt. No. 50, 2022 WL 9348792 (D. Utah Oct. 14, 2022); *United States* v. *Ortiz*, No. 3:21-cr-2503, Dkt. No. 91 (S.D. Cal. Oct. 14, 2022); *United States* v. *Riley*, No. 1:22-cr-163, Dkt. No. 37, 2022 WL 7610264 (E.D. Va. Oct. 13, 2022); *United States* v. *Price*, No. 2:22-cr-97, --- F. Supp. 3d ----, 2022 WL 6968457, at *6-9 (S.D. W.Va. Oct. 12, 2022); *United States* v. *King*, No. 7:21-cr-255, Dkt. No. 50, 2022 WL 5240928 (S.D.N.Y. Oct. 6, 2022); *United States* v. *Daniels*, No. 1:03-cr-83, Dkt. No. 69, 2022 WL 5027574 (W.D.N.C. Oct. 4, 2022); *United States v. Charles*, No. 7:22-cr-154, Dkt. No. 48, 2022 WL 4913900 (W.D. Tex. Oct. 3, 2022); *United States v. Williams*, No. 3:21-cr-478, Dkt. No. 76 (S.D. Cal. Sept. 30, 2022); *United States v. Harper*, No. 5:21-cr-4085, 2022 WL 8288406 (N.D. Iowa Sept. 9, 2022), report and recommendation adopted, 2022 WL 4595060 (N.D. Iowa Sept. 30, 2022); *United States v. Campbell*, No. 5:22-cr-138, Dkt. No. 64 (W.D. Okla. Sept. 27, 2022); *United States v. Siddoway*, No. 1:21-cr-205, Dkt. No. 54, 2022 WL 4482739 (D. Idaho Sept. 27, 2022); *United States* v. *Perez*, No. 3:21-cr-508, Dkt. No. 78 (S.D. Cal. Sept. 26, 2022); *United States v. Collette*, No. 7:22-cr-141, Dkt. No. 66, 2022 WL 4476790 (W.D. Tex. Sept. 25, 2022); *United States v. Delpriore*, No. 3:18-cr-136, Dkt. No. 287 (D. Ak. Sept. 23, 2022); *United States* v. *Coombes*, No. 4:22-cr-189, Dkt. No. 39, 2022 WL 4367056 (N.D. Okla. Sept. 21, 2022); *United States v. Hill*, No. 3:21-cr-107, Dkt. No. 70, 2022 WL 4361917 (S.D. Cal. Sept. 20, 2022); *United States v. Rojo*, No. 3:21-cr-682, Dkt. No. 50 (S.D. Cal. Sept. 14, 2022); *United States v. Cockerham*, No. 5:21-cr-6, Dkt. No. 31 (S.D. Miss. Sept. 13, 2022); *United States* v. *Jackson*, No. 0:21-cr-51, Dkt. No. 114, 2022 WL 4226229 (D. Minn. Sept. 13, 2022); *United States v. Havins*, No. 3:21-cr-1515, Dkt. No. 62 (S.D. Cal. Sept. 12, 2022); *United States v. Patterson*, No. 7:19-cr-231 (S.D.N.Y. Sept. 9, 2022); *United States v. Doty*, No. 5:21-cr-21, Dkt. No. 34 (N.D. W.Va. Sept. 9, 2022); *United States v. Burrell*, No. 3:21-cr-20395, Dkt. No. 34, 2022 WL 4096865 (E.D. Mich. Sept. 7, 2022); *United States v. Randle*, No. 3:22-cr-20, Dkt. No. 34 (S.D. Miss. Sept. 6, 2022); *United States v. Ingram*, No. 0:18-cr-557, Dkt. No. 1714, --- F. Supp. 3d ---, 2022 WL 3691350 (D. S.C. Aug. 25, 2022); *United States v. Nevens*,

Defendant urges this Court to follow the Third Circuit, which found 18 U.S.C. § 922(g)(1) unconstitutional as applied to an individual who was previously convicted of making a false statement on an application for food stamps in 1995 and years later sought to purchase a deer-hunting rifle or a shotgun for self-defense at home. The Third Circuit, in *Range*, was faced with entirely different facts when it found § 922(g)(1) unconstitutional *as applied* to the petitioner, in a decision that court described as "a narrow one." *Range*, 69 F.4th at 106. Here, unlike the petitioner in *Range*, the defendant was previously convicted for a violent crime involving a deadly weapon and subsequently arrested for illegally possessing a loaded firearm.

In contrast to the readily distinguishable, narrow decision of the Third Circuit, the Eighth Circuit and Tenth Circuit have both upheld the constitutionality of § 922(g)(1) post-*Bruen. See United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023) (finding "legislatures traditionally employed status-based restrictions to disqualify categories of persons from possessing firearms. Whether those actions are best characterized as restrictions on persons who deviated from legal norms or persons who presented an unacceptable risk of dangerousness, Congress acted within the historical tradition when it enacted § 922(g)(1) and the prohibition on possession of firearms by felons."); *United States v. Cunningham*, 70 F.4th 502, 504 (8th Cir. 2023) (concluding there is "no need for felony-by-felony determinations regarding the constitutionality of § 922(g)(1)"); *Vincent v. Garland*, 80 F.4th 1197 (10th Cir. 2023) (finding *Bruen* did not abrogate prior circuit precedent because "the emergence of a new test doesn't necessarily invalidate our earlier precedent").

---

No. 2:19-cr-774, Dkt. No. 121 (C.D. Cal. Aug. 15, 2022); *United States v. Farris*, No. 1:22-cr-149, Dkt. No. 29 (D. Colo. Aug. 12, 2022); *United States v. Adams*, No. 1:20-cr-628 (S.D.N.Y. Aug. 10, 2022); *United States v. Ramos*, No. 2:21-cr-395, Dkt. No. 31 (C.D. Cal. Aug. 5, 2022); *United States* v. *Doss*, No. 4:21-cr-74, Dkt. No. 126 (S.D. Iowa Aug. 2, 2022); *United States v. Maurice*, No. 7:22-cr-48 (S.D.N.Y. Jul. 14, 2022).

Pre-*Bruen* courts of appeals also "have consistently upheld applications of § 922(g)(1) even to nonviolent felons." *United States v. Pruess*, 703 F.3d 242, 247 (4th Cir. 2012) (collecting cases). And several courts of appeals have recognized that "statutes disqualifying felons from possessing a firearm under all circumstances do not offend the Second Amendment. *United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010); *see also United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009); *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010).

Finally, many colonies did not even require dangerousness for disarmament. As mentioned above, there were colonial-era laws disarming those who defamed acts of Congress, failed to swear allegiance to the state, or refused to defend the colonies. *Folajtar*, 980 F.3d at 908 & n.11 (reviewing colonial laws from Connecticut, Pennsylvania, and Massachusetts). Moreover, as noted above, "at their ratification conventions, several states proposed amendments limiting the right to bear arms to both law abiding and 'peaceable' citizens." *Id*. at 908 (reviewing proposed amendments in Pennsylvania, New Hampshire, and Massachusetts). Even if some of the laws at or near the Founding were concerned about dangerousness*, see, e.g., Bruen*, 142 S. Ct. at 2148 (discussing how colonial surety laws did not ban public carry of firearms, but targeted only those "armed offensively, to the fear or terror of the good citizens of this Commonwealth") (quoting 1795 Mass. Acts and Laws ch. 2, at 436, in Laws of the Commonwealth of Massachusetts), "dangerousness was one reason to restrict firearm possession, but it was hardly the only one." *Folajtar*, 980 F.3d at 909. Accordingly, § 922(g)(1)'s prohibition on felons bearing arms is firmly rooted in this nation's history. And certainly, as applied to the defendant who has demonstrated a dangerous criminal history, specifically a history of being involved in the violent use of a firearm, § 922(g)(1) remains constitutional.

/ / /

/ / /

24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**CONCLUSION**

For the reasons set forth above, the government respectfully requests that the Court deny the defendant's motion to dismiss. Nothing in *Bruen* casts doubt on the constitutionality of 18 U.S.C. § 922(g)(1). The Second Amendment's plain text does not extend to the defendant's conduct. Section 922(g)(1) falls within the nation's long-standing tradition of disarming citizens who engage in criminal activity or are otherwise not law-abiding.

**DATED** this 5th day of January, 2024.

Respectfully submitted,

JASON M. FRIERSON
United States Attorney

*/s/ Andrew Keenan*
ANDREW KEENAN
Assistant United States Attorney