**Rene L. Valladares**
Federal Public Defender
Nevada State Bar No. 11479
**Allie Wilson**
Assistant Federal Public Defender
200 South Virginia Street, Suite 340
Reno, Nevada 89501
(775) 321-8451
allie_wilson@fd.org

Attorney for **Esteban Adame-Lopez**

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| United States of America, | Case No. 3:23-cr-024-LRH-CLB |
| Plaintiff, | **Reply in Support of Motion to Dismiss** |
| v. | [Hearing Requested][1] |
| **Esteban Adame-Lopez**, | |
| Defendant. | |

I.      **Introduction**

The Supreme Court requires that the government "affirmatively prove" a comparable historical tradition justifying any challenged firearms regulation. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2127 (2022). Ninth Circuit precedent that pre-dates *Bruen* and does not apply this rule has therefore been abrogated.

The government cannot escape its *Bruen* burden simply because Mr. Adame-Lopez has a prior felony conviction. People with felony convictions are people within the meaning of the Constitution. They have constitutional rights that include the right to keep and bear

---

[1] This motion is timely filed. ECF No. 20.

1   arms under the Second Amendment. Whether a restriction on that right passes constitutional

2   muster is subject to a *Bruen* analysis.

3   Applying *Bruen*, the statute at issue here—18 U.S.C. § 922(g)(1)—fails. The

4   government's response does not identify any laws that imposed a permanent, categorical,

5   criminal ban on people with felony convictions possessing firearms. This indictment should

6   be dismissed.

7   **II.    Argument**

8   **A.    Bruen Abrogated United States v. Vongxay.**

9   *Bruen* abrogated all prior Ninth Circuit precedent on gun regulations, including *United*

10   *States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010), which held without historical analysis that

11   individuals with felony convictions could be divested of their rights to own firearms. That

12   case is "clearly irreconcilable" with the new *Bruen* history-and-tradition test. *Miller v.*

13   *Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). So, contrary to the government's

14   argument, this Court should apply *Bruen* and not *Vongxay*.

15   The landscape is thus: (1) there is a pre-*Bruen* Ninth Circuit case (*Vongxay*) that says

16   § 922(g)(1) passes Second Amendment scrutiny; and (2) there is *Bruen*, which says courts of

17   appeals have uniformly botched the Second Amendment inquiry after *District of Columbia v.*

18   *Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010). 142 S.

19   Ct. at 2128–30. In light of *Bruen*, the question is not whether *Heller* and *McDonald* are

20   consistent with *Bruen*, *contra* ECF No. 21 at 6, but whether the Ninth Circuit's *Vongxay*

21   decision is, *see Gammie*, 335 F.3d at 900.

22   The government insists that *Vongxay* remains good law because *Bruen* "only

23   reinforced" the Supreme Court's two prior landmark gun-rights cases, *Heller* and *McDonald*.

24   ECF No. 21 at 8. But, *Vongxay*'s approach is inconsistent with *Bruen*. Indeed, the government

25   acknowledges that *Bruen* "rejected" the "post-*Heller* test" that the Ninth Circuit used to

26   apply. ECF No. 21 at 5. Yet, the government states that *Bruen* did not "erase the two-step

2

1    analysis entirely." ECF No. 21 at 6. But, *Bruen* explicitly did just that: the second means–end

2    step, *Bruen* says, is "one step too many." 142 S. Ct. at 2127. There is now just one step: the

3    history-and-tradition analysis.

4           The basis for that "reject[ion]" is that, according to *Bruen*, the Ninth Circuit's test

5    conflicted with the core history-and-tradition test from *Heller* and *McDonald*. *Id.* In

6    particular, *Bruen* identified that two techniques—"applying means–end scrutiny" and

7    allowing restrictions without "affirmative[] pro[of]" of a "historical tradition"—conflict with

8    the Second Amendment. *Id.* Instead, the appropriate test demands that the government

9    "affirmatively prove" that every challenged regulation "is part of the historical tradition that

10   delimits the outer bounds of the right to keep and bear arms." *Id.*

11          That "reject[ion]" necessarily abrogates *Vongxay*, which applied a presumption of

12   constitutionality. *Vongxay*, 594 F.3d at 1115. *Bruen* now requires that, in every firearms case,

13   "the government must demonstrate that the regulation is consistent with this Nation's

14   historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. *Vongxay* upheld §

15   922(g)(1) without putting the government to that burden, and therefore without affirmative

16   proof of a historical tradition. 594 F.3d at 1115–18. In fact, *Vongxay* upheld the statute despite

17   identified historical uncertainty, recognizing that "the historical question" "has not been

18   definitively resolved." *Id.* at 1118. *Vongxay*'s holding is therefore "directly at odds" with

19   *Bruen*'s historical-tradition requirement. *Gammie*, 335 F.3d at 900; *United States v. Lindsey*,

20   634 F.3d 541, 550 (9th Cir. 2011) (emphasizing that the abrogation analysis focuses on "the

21   *reasoning* and *analysis* in support of a holding, rather than the holding alone" (emphasis in

22   original)). *Vongxay* is no longer good law.

23          And, two recent Ninth Circuit decisions confirm that pre-*Bruen* precedents like

24   *Vongxay* are no longer good law: *Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023) and *Baird v.*

25   *Bonta*, 81 F.4th 1036 (9th Cir. 2023).

26

3

1    In *Teter*, two plaintiffs challenged a Hawaii statute criminalizing the possession of

2  butterfly knives. 75 F.4th at 942. The district court rejected the challenge based on *United*

3  *States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013), which *Teter* described as "then-binding

4  precedent." 75 F.4th at 942 & n.1. In *Chovan*, the Ninth Circuit rejected a Second

5  Amendment challenge to another federal prohibition on firearm possession: § 922(g)(9). 735

6  F.3d at 1133-42. Because *Bruen* abrogated *Chovan*, the Ninth Circuit was free to reconsider

7  the underlying Second Amendment issues in *Teter*. 75 F.4th at 942 &n.1, 947-48. The Ninth

8  Circuit, in fact, explicitly stated "*Bruen* abrogated the two-step approach we had adopted

9  following *Heller* and *McDonald* to analyze Second Amendment challenges." *Id.* at 947. And

10  the Ninth Circuit cited another case that previously upheld restrictions on large-capacity

11  magazines—*Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015)—with the caveat that *Bruen*

12  abrogated *Fyock* too. *Teter*, 76 F.4th at 950.

13    In other words, *Teter* repeatedly indicates that the Ninth Circuit's prior Second

14  Amendment caselaw is no longer controlling. *Teter* cites two prior Ninth Circuit decisions

15  rejecting Second Amendment challenges—one to § 922(g)(9), the other to municipal

16  restrictions on large capacity magazines—and says *Bruen* abrogated those two decisions.

17  More broadly, *Teter* explains that *Bruen* set forth "a new standard" that is inconsistent with

18  the previous methodology the Ninth Circuit used to assess Second Amendment challenges. *Id.*

19  at 947.

20    *Baird* is similar. There, the Ninth Circuit reversed the denial of a preliminary

21  injunction in a challenge to California's ban on open carry. *Baird*, 81 F.4th at 1048. Notably,

22  the Ninth Circuit cited none of its pre-*Bruen* caselaw in instructing the district court on

23  remand. *Id.* Rather, under *Bruen*'s new standard, the government had to satisfy a

24  "demanding" standard "for identifying a closely analogous historical regulation." *Id.* at 1046.

25  Both *Teter* and *Baird*, therefore, teach that the analysis for post-*Bruen* challenges is

26  qualitatively different from (and inconsistent with) the Ninth Circuit's pre-*Bruen* decisions.

4

1       None of the government's arguments to the contrary is persuasive. The government

2   cites, for instance, a handful of district court cases that have applied *Vongxay* post-*Bruen*.

3   ECF No. 21 at 9-10. None of those cases, however, addressed the fact that *Bruen* requires

4   every regulation to be supported by "affirmative[] pro[of]" of a "historical tradition." *Bruen*,

5   142 S. Ct. at 2127; *cf. United States v. Delpriore*, No. 3:18-cr-136, 2022 WL 17490771, at

6   \*2–3 (D. Alaska Oct. 4, 2022) (not addressing that); *United States v. Siddoway*, No. 1:21-cr-

7   205, 2022 WL 4482739, at \*1–2 (D. Idaho Sept. 27, 2022) (same); *United States v. Hill*, No.

8   21-cr-107, 2022 WL 4361917, at \*2–3 (S.D. Cal. Sept. 20, 2022) (same); *United States v.*

9   *Nevens*, No. 19-cr-774, 2022 WL 17492196, at \*2 (C.D. Cal. Aug. 15, 2022) (same). Rather,

10  each simply concluded that, because *Bruen* reaffirmed *Heller*, all Ninth Circuit cases that rely

11  on *Heller* must remain good law. But that reasoning misunderstands how Supreme Court

12  precedent interplays with circuit precedent. *Vongxay*'s "mode of analysis" conflicts with

13  *Bruen*. *Gammie*, 335 F.3d at 900. So, *Vongxay* has been abrogated and the government's

14  reliance on *Vongxay* and its progeny is therefore misplaced.

15      The government also claims that *Bruen* does not apply at all. The government first

16  argues that the Supreme Court's occasional use of the phrase "law-abiding citizens" in its gun

17  regulation decisions restricts the Second Amendment to those without felony convictions.

18  ECF No. 40 at 8-9. But that language is just a description of the plaintiffs at issue in *Heller*,

19  *McDonald*, and *Bruen*. 554 U.S. at 575–76; 561 U.S. at 750–51; 142 S. Ct. at 2124–25. The

20  decisions did not limit the Second Amendment's protections to those types of people.

21      Relatedly, the government suggests that *Heller* and *McDonald*'s reference to

22  "longstanding prohibitions" on certain types of individuals owning firearms insulates those

23  prohibitions from *Bruen*'s historical analysis. *See* ECF 21 at 4, 6, 8, 10, 12. But that language

24  was expressly disclaiming any holding on those prohibitions, not implicitly concluding those

25  prohibitions were constitutional. "The constitutionality of felon dispossession was not before

26  the Court" in either of those cases. *Kanter v. Barr*, 919 F.3d 437, 453 (7th Cir. 2019) (Barrett,

5

J., dissenting); *see id.* at 445 (majority opinion agreeing with that point). And by emphasizing

that "nothing" in the opinion addressed the question, the Court had "explicitly deferred

analysis of th[e] issue." *Id.* at 453.[2] Indeed, that much follows a basic principle of law: a

court's opinion should not be read for more than it holds. *See, e.g.*, *Cetacean Cmty. v. Bush*,

386 F.3d 1169, 1173 (9th Cir. 2004) (identifying that statements are "nonbinding dicta" if

"unnecessary to the decision in the case" (quotation omitted)). The Court was not resolving

the constitutionality of such "longstanding prohibitions," many of which (including § 922(g))

only emerged in the 20th century. *See Folajtar v. Att'y Gen. of United States*, 980 F.3d 897,

913 (3d Cir. 2020) (Bibas, J., dissenting) ("Longstanding bans are centuries old, not within

living memory. The federal felon-in-possession ban, however, did not begin to reach beyond

violent crimes until 1961."). Those prohibitions still face the "affirmative[] pro[of]"

requirement of *Bruen*.

      The government further claims that Justice Kavanaugh's concurring opinion in *Bruen*

(which quoted the same *Heller* dicta) governs under the *Marks* rule. ECF No. 21 at 6. But that

rule applies only when a case produces no majority opinion. *Marks v. United States*, 430 U.S.

188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining

the result enjoys the assent of five Justices, the holding may be viewed as that position taken

by those Members who concurred in the judgments on the narrowest grounds." (quotation

---

[2] Most courts (even those that have ultimately upheld dispossession laws) have treated *Heller* and *McDonald*'s discussion of "longstanding prohibitions" as dicta. *E.g.*, *Kanter*, 919 F.3d at 445 (identifying that "the Court never actually addressed the historical pedigree of felon dispossession laws" and accordingly "refus[ing] to read too much into" that "precautionary language"); *Folajtar v. Att'y Gen. of United States*, 980 F.3d 897, 913 (3d Cir. 2020) (Bibas, J., dissenting) ("[That] remark was dictum. *Heller* did not and had no occasion to resolve when governments may disarm felons."); *see also United States v. McCane*, 573 F.3d 1037, 1049 (10th Cir. 2009) (Tymkovich, J., concurring) (identifying the "odd[ity]" of *Heller*'s "*deus ex machina* dicta").

omitted)).[3] *Bruen* produced a majority opinion that six justices (including Justice Kavanaugh)

joined in full. 142 S. Ct. at 2121. That majority opinion controls. *Id.* Any concurring opinions

are not "binding," ECF No. 21 at 6; they are merely supplemental thoughts joined by a

minority of justices.

In brief, *Vongxay*'s core reasoning—that felon dispossession is acceptable even absent

a historical analysis—has been abrogated by *Bruen*. Post-*Bruen*, the government must

affirmatively prove a historical tradition justifying such restrictions. There are no immovable

presumptions of constitutionality. The government cannot shield this statute from review with

outdated case law.

**B.      People with felony convictions are people.**

Nor are people with felony convictions excluded from the *Bruen* analysis. A

regulation of any person's right to keep and bear arms violates the Constitution if it is

unsupported by history and tradition. *Bruen*, 141 S. Ct. at 2131–32. People with felony

convictions proceed under the same framework. *See id.*

The government nonetheless claims that people with felony convictions "fall entirely"

outside the Second Amendment's protections—essentially arguing that they are not part of

"the people." ECF No. 21 at 9. Per the government, only "law-abiding, responsible citizens"

(whatever that means) can access the Second Amendment. *Id.* at 8. And that conclusion, the

government says, comes from the Second Amendment's "plain text." *Id*.

---

[3] The *Marks* rule generally only applies when the Court issues a plurality opinion plus a concurrence-in-the-judgment. *See* Richard M. Re, *Beyond the* Marks *Rule*, 132 Harv. L. Rev. 1942, 1948–65 (2019) (describing various cases that fit that mold). When the justices "endorse a single rule of decision . . . by publishing a majority opinion" (as they did in *Bruen*), *Marks* does not apply. *Id.* at 1943; *accord, e.g.*, *United States v. Lawson*, 686 F.3d 1317, 1321 n.2 (11th Cir. 2012) (identifying that *Marks* is only applicable "when a Supreme Court decision lacks a majority opinion"); *A.T. Massey Coal Co. v. Massanari*, 305 F.3d 226, 236 (4th Cir. 2002) (same).

But the Second Amendment says that its protections apply to "the people"—all of them. U.S. Const. amend. II ("[T]he right of the people to keep and bear arms, shall not be infringed.")[4]; *accord Heller*, 554 U.S. at 580 (emphasizing that "the people" protected by the Second Amendment "unambiguously refers to all members of the political community, not an unspecified subset"). So, like everyone else, restrictions on people with felony convictions owning firearms or ammunition are subject to a *Bruen* analysis.

The government's argument to the contrary disregards basic constitutional principles. Most obviously, the government's law-abiding-and-responsible-citizens claim would apparently extend to identical "the people" language in the First, Fourth, Ninth, and Tenth Amendments. U.S. Const. amend. I, IV, IX, X; *see Heller*, 554 U.S. at 580 (identifying that all these amendments use the same "the people" language as a "term of art" (quotation omitted)). So, the government's position would seem to be that only "law-abiding, responsible citizens" get assembly rights, search-and-seizure protections, and other guarantees. ECF No. 21 at 8. But that is not how constitutional law works. *See Entler v. Gregoire*, 872 F.3d 1031, 1039 (9th Cir. 2017); *United States v. Lara*, 815 F.3d 605, 609 (9th Cir. 2016). People with felony convictions retain their constitutional rights, Second Amendment rights included.

In fact, the government's position seems to reject the notion of constitutionalism itself. If, as the government claims, constitutional rights depend on being a "law-abiding, responsible citizen[]," legislatures could, by statute alone, divest individuals of constitutional rights. ECF No. 21 at 11. Ordinary law, after all, would seem capable of turning individuals from "law-abiding" and "responsible" to not. *Id.* The Constitution is, however, "superior to

---

[4] Founding-era dictionaries define "people" as, for instance, "those who compose a community" and "every person." *See, e.g.*, 2 Samuel Johnson, *A Dictionary of the English Language* (1766) ("A nation; those who compose a community"), *available at* https://tinyurl.com/y95erjwf; Thomas Dyche & William Pardon, *A New General English Dictionary* (14th ed. 1771) ("People" "signifies every person, or the whole collection of inhabitants in a nation or kingdom"), *available at* https://tinyurl.com/uk4b4fxd.

1  any ordinary act of the legislature." *Marbury v. Madison*, 5 U.S. 137, 178 (1803). Letting the

2  legislature select who gets the Constitution's protections would flip that ordering, thereby

3  "giving to the legislature a practical and real omnipotence." *Id.* That would "subvert the very

4  foundation of all written constitutions." *Id.* Elevating statute over Constitution in that way, the

5  Supreme Court has long held, should therefore be avoided. *Id.*

6        The government further ignores in its argument that the Third Circuit in *Range*, along

7  with other courts, have already rejected the same argument it is making here. *See* ECF 17 at 9-

8  10 (citing *Range v. Att'y Gen. of the U.S.*, 69 F.4th 96, 101-103 (3rd Cir. 2023)); *see also*

9  *United States v. Griffin*, No. 21-cr-00693, 2023 WL 8281564, at *3-4 (N.D. Ill. Nov. 30,

10 2023) (finding that the Second Amendment includes individuals with felony convictions and

11 dismissing a § 922(g)(1) indictment); *United States v. Glen Prince*, No. 22-cr-240, 2023 WL

12 7220127, at *5 (N.D. Ill. Nov. 2, 2023) (same); *United States v. Forbis*, 2023 WL 5971142, at

13 *3 (N.D. Okla Aug. 17, 2023) (same); *United States v. Harper,* No. 1:21-cr-0236, 2023 WL

14 5672311, at *8 (M.D. Pa. Sept. 1, 2023) (same)*; United States v. Quails*, __ F. Supp. 3d __,

15 2023 WL 5401733 (M.D. Pa. Aug. 22, 2023) (same)*. See also United States v. Detrant*, No.

16 2:22-cr-00244-DJC-1, 2023 WL 7723303 (E.D. Cal. Nov. 15, 2023) (granting motion to

17 withdraw plea to § 922(g)(1) per *Bruen*)*.

18       In short, people with felony convictions are people. They have constitutional rights—

19 including Second Amendment rights—like everyone else. The legislature cannot take those

20 rights away by labeling them felons, never mind by labeling them "[ir]responsible." Naturally,

21 those rights are not absolute. But whether a restriction on those rights is constitutional is

22 subject to *Bruen*'s history-and-tradition analysis.

23

24

25

26

9

**C.      Section 922(g)(1) is unconstitutional under the applicable *Bruen* rule.**

Section 922(g)(1) fails scrutiny under *Bruen*. It is a general-societal-problem regulation. But, no comparable tradition justifies a permanent, categorical, criminal bar on people with felony convictions possessing firearms. The statute is unconstitutional.

**1.      The government asks this Court to apply the wrong *Bruen* analysis.**

The government begins its *Bruen* analysis with a fundamental categorization error. For *Bruen* purposes, there are two types of regulations: (1) general-societal-problem regulations that must be grounded in actual "historical precedent"; and (2) unimaginable-at-the-founding regulations that can be justified by "analogical reasoning." *Bruen*, 142 S. Ct. at 2131–32.

The government claims that § 922(g)(1) is of the second type: a "modern regulation[] unimaginable at the founding." ECF No. 21 at 11 (quoting *Bruen*, 142 S. Ct. at 2132, 2133). And so, the government claims, it can be justified by "analogical reasoning" alone. *Id.*

The government is wrong. Section 922(g)(1) is a general-societal-problem regulation. *Bruen*, 142 S. Ct. at 2131. People with felony convictions existed in the 18th century. And like the urban handgun problem at issue in *Bruen*, some people with felony convictions have been perceived to be dangerous since at least that time. That makes the subject of § 922(g)(1) an issue "that has persisted since the 18th century," thereby placing § 922(g)(1) in the general-societal-problem bucket. *Bruen*, 142 S. Ct. at 2131.

The government's categorization error ultimately dooms its analysis. Unlike an unimaginable-at-the-founding restriction, a general-societal-problem restriction requires "a distinctly similar regulation" from our nation's history and tradition. *Bruen*, 142 S. Ct. at 2131. The government cannot get by with "analogical reasoning." *Id.* at 2132. It must identify specific "historical precedent" that "evinces a comparable tradition of regulation." *Id.* at 2131–32. If the government's proffered examples are "materially different" in any way, the statute is unconstitutional. *Id.* at 2131. And, the Ninth Circuit has further defined "comparable" laws to mean laws that: (1) "curtail[] the right . . . to a comparable degree"; (2)

impose penalties with "comparable severity"; and (2) have a "comparable [level of] enforcement." *Baird*, 81 F.4th at 1047.

### 2. The government has not identified any historical precedent that justifies § 922(g)(1).

The government presents three primary arguments—(1) capital punishment and estate forfeiture, (2) "virtue theory," and (3) Catholic-and-traitor disarmament—that it claims justify § 922(g)(1). ECF No. 21 at 13-20. None support permanently and categorically divesting all those with felony convictions of the ability to possess firearms and subjecting them to a lengthy possible jail sentence for firearm possession. Under the proper *Bruen* framework, § 922(g)(1) fails.

### i. Capital Punishment and Estate Forfeiture

First, the government claims that, since felons could sometimes be "sentenced to death," it would have been "nonsensical" to separately dispossess them of firearms. ECF No. 21 at 12, 17–18. The argument fails.

For one, that some ex-felons were once stripped of all rights through execution is irrelevant to determining a regulation's constitutionality. "[W]e wouldn't say that the state can deprive felons of the right to free speech because felons lost that right via execution at the time of the founding." *Kanter*, 919 F.3d at 461-62 (Barrett, J., dissenting). Were it otherwise, ex-felons would have no constitutional rights at all. And yet they do. *E.g.*, *Lara*, 815 F.3d at 609; *Entler*, 872 F.3d at 1039.

But, even if execution could theoretically be a meaningful "tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2126, the historical facts disprove its use as a tool of categorical dispossession. By the Founding Era, execution was not the dominant form of punishment even in England. Between 1718 and 1769, for instance, about 15.5% of felons convicted in London's chief criminal court received the death penalty. Javier Bleichmar, *Deportation as Punishment: A Historical Analysis of the British Practice of Banishment and Its Impact on Modern Constitutional Law*, 14 Geo. Immigr. L.J. 115, 126 (1999) (citing A.

Roger Ekirch, *Bound For America: The Transportation Of British Convicts To The Colonies* 1718-1775, at 21 (1987)).

Execution was even less common in the early United States. *Id.* at 20; *see also Kanter*, 919 F.3d at 459 (Barrett, J., dissenting). As James Wilson, a leading Framer sometimes called the "craftsman of the Constitution,"[5] told a Virginia grand jury in 1791, "how few are the capital crimes, known to the laws of the United States, compared with those known to the laws of England!" John D. Bessler, *Cruel & Unusual: The American Death Penalty and the Founders' Eighth Amendment* 52 (2012) (citation omitted); *see also Heller*, 554 U.S. at 607 (identifying that American history governs over British if the two conflict); *Bruen*, 142 S. Ct. at 2138–39 (same).

In addition, execution's main purpose was not to relieve offenders of their guns. It was instead a separate punishment without consideration of an offender's right to own weapons. So, execution is, at best, a "materially different" treatment of the relevant general-societal-problem and so fails to meet *Bruen*'s historical precedent test. *Bruen*, 142 S. Ct. at 2131.

As to forfeiture, *see* ECF 21 at 17-18, forfeiture as punishment was ordinarily only retroactive, removing those guns the ex-felon already owned. Even in England, "it did not follow that one could not thereafter purchase and hold new personal property—including a gun." C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J. L. & Pub. Policy 695, 714 (2009). And more importantly, the Framers tended to "condemn forfeiture of property, a[t] least in cases of felony, as being an unnecessary and hard punishment of the felon's posterity." 2 James Kent, *Commentaries on American Law* 386 (O.W. Holmes, Jr., ed., 12th ed., Little, Brown, & Co. 1873) (1826). The inability to hold firearms in death or as

[5] Nicholas Mosvick, *Forgotten Founders: James Wilson, Craftsman of the Constitution*, Nat'l Const. Ctr. (July 13, 2020), *available at* https://constitutioncenter.org/blog/forgotten-founders-james-wilson-craftsman-of-the-constitution.

12

part of temporary forfeiture do not, in short indicate a historical tradition of prospectively

criminalizing firearm ownership by ex-felons.

### ii.   "Virtue Theory"

Second, the government tries to ground § 922(g)(1) in various forms of so-called

"virtue theory"—essentially, the idea that those deemed "unvirtuous" can be dispossessed of

their firearms. ECF No. 21 at 12-13 (quotation omitted); *see id.* at 18-19. But the government

has not identified any primary source evidence for that theory. In fact, there is no primary

source evidence supporting that theory.

Even on its own terms, the "virtue" theory does not justify categorical ex-felon

dispossession. To the extent the history suggests that early modern America stripped the

unvirtuous of certain rights, that rule applied only to civic rights (such as jury service or

voting), not individual rights (such as the freedom of speech). *Kanter*, 919 F.3d at 462–63

(Barrett, J., dissenting); *Folajtar*, 980 F.3d at 916 (Bibas, J., dissenting). As several Third

Circuit judges have identified:

> [T]his virtuous-citizens-only conception of the right to keep and bear arms is
> closely associated with pre-*Heller* interpretations of the Second Amendment
> by [scholars] . . . who rejected the view that the Amendment confers an
> individual right and instead characterized the right as a "civic right . . .
> exercised by citizens, not individuals . . . who act together in a collective
> manner, for a distinctly public purpose: participation in a well regulated
> militia."

*Binderup*, 836 F.3d at 371 (Hardiman, J., concurring) (citation omitted). And so, by rejecting

the civic-right view of the Second Amendment, *Heller* forecloses such a virtue-limitation.

*See, e.g.*, *Kanter*, 919 F.3d at 463 (Barrett, J., dissenting). Per *Heller*, the right to keep and

bear arms is "an individual right," 554 U.S. at 595, so it cannot be limited on virtuousness

grounds, *Kanter*, 919 F.3d at 463 (Barrett, J., dissenting). So-called "virtue" theory is thus

inconsistent with the Second Amendment in both history and doctrine.

### iii.  Catholic and Traitor Disarmament

And, finally, the government suggests that § 922(g)(1) resembles the dispossession of Catholics and perceived traitors in the 17th and 18th centuries. ECF No. 21 at 13–17. But, those efforts were temporary, targeted (generally religiously-so), and full of carveouts, in particular for purposes of self-defense.

The government first points to the disarmament of Catholics during the 17th century. ECF 21 at 14. It is true that, in the age of William and Mary (both Protestants), Catholics were restricted in their ability to keep arms because they were presumed loyal to James II (a Catholic trying to retake the throne) and therefore categorically treasonous. Specifically, Catholics could only keep "Arms, Weapons, Gunpowder, [and] Ammunition" if they declared allegiance to the Crown and renounced key parts of their faith. *See Bruen*, 142 S. Ct. at 2142 n.12 (quoting 1 Wm. & Mary c. 15, § 4, in 3 Eng. Stat. at Large 399 (1688)); *see also* An Act for the more effectuall preserving the Kings Person and Government by disabling Papists from sitting in either House of Parlyament, 1 Charles II stat. 2, in 5 Stat. of the Realm at 894–96 (1678). But even then, Catholics could keep some arms for self-defense; they could "keep 'such necessary Weapons as shall be allowed . . . by Order of the Justices of the Peace . . . for the Defence of his House or Person.'" *Bruen*, 142 S. Ct. at 2142 n.12 (omissions in original) (quoting 1 Wm. & Mary c. 15, § 4, in 3 Eng. Stat. at Large 399 (1688)). Thus, even when England assumed that Catholics were engaged in mass treason, they still had "a right to own arms for personal defense." Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 123 (1994).

The government then points to dispossession efforts in the American colonies, *see* ECF 21 at 14-16, but none that justify the categorical bar imposed by § 922(g)(1). Such restrictions were ordinarily both targeted and regulatory, rather than blanket and criminal. For example, like England, the colonial Virginia government disarmed Catholics (still viewed as traitors to the Crown) who would not "swear an oath abjuring the ecclesiastical authority of

14

the Pope." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 157 (2007) (citation omitted). But even in disarming Catholics, there were exceptions for firearm possession for self-defense; a justice of the peace could authorize possession "for the defense of his house and person." *Id.* Similarly, following the Declaration of Independence, Pennsylvania ordered that those who did not pledge allegiance to the Commonwealth and renounce British authority be disarmed. *Id.* at 159. But, even such dispossession was directed at national allegiance (rather than criminal past) and regulatory (rather than criminal). *Id.*

The government further identifies colonial Connecticut's disarmament of those who "libel[ed]" or "defam[ed]" the state legislature. ECF No. 21 at 15-16. But, that law similarly allowed the targeted individuals to restore their rights under many conditions, *see* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 268 (2020) (identifying that the colonial Connecticut law only disarmed "inimical" persons "until such a time as he could prove his friendliness to the liberal cause" (quotation omitted), and describing the law as an "example[]" of "persons having their right to keep and bear arms restored"). And Connecticut's law targeted perceived traitors, not all individuals with felony convictions everywhere.

Like Connecticut's law, other targeted dispossessions were generally temporary. For example, leaders of the early Massachusetts Bay Colony once briefly disarmed supporters of a banished seditionist. Greenlee, *supra*, at 263 (citations omitted). But those individuals could get their guns returned, at least on some conditions; "[s]ome supporters who confessed their sins were welcomed back into the community and able to retain their arms." *Id.* And in 1787, the participants in Shay's Rebellion—who had attacked courthouses, a federal arsenal, and the Massachusetts militia—were barred from bearing arms for only three years. *Id.* at 268–67. In the meantime, the Commonwealth of Massachusetts acted as the bailee of the rebels' arms,

15

1    tasked by law with returning the weapons to the rebels after that period. Sec'y of the

2    Commonwealth, *Acts and Resolves of Massachusetts 1786–87*, at 178 (1893).

3         The historical tradition at the Framing, in other words, did not routinely dispossess ex-

4    felons of their firearms, never mind permanently. "The Founding generation had no laws

5    limiting gun possession by . . . people convicted of crimes." Adam Winkler, *Heller's Catch-*

6    *22*, 56 UCLA L. Rev. 1551, 1563 n.67 (2009). Indeed, if anything, the tradition was to return

7    seized firearms to defendants after any threat to society dissipated. That tradition conflicts

8    with a permanent, class-based, criminal law like § 922(g)(1).

9    **II.      Conclusion**

10        The government has failed to meet its burden under *Bruen*, and the Court should

11   dismiss the indictment.

12

13        **Dated**: January 12, 2024                    **Rene L. Valladares**
                                                          Federal Public Defender

14                                                         By: /s/ Allie Wilson
                                                           **Allie Wilson**
15                                                          Assistant Federal Public Defender
                                                           Attorney for **Esteban Adame-Lopez**

16

17

18

19

20

21

22

23

24

25

26

16